SOUTHEASTERN PROMOTIONS, LIM-
ITED, and Pumpkin Promotions,
Limited, Plaintiffs,

v.

CITY OF CHARLOTTE, NORTH CARO-
LINA, et al., Defendants.

Civ. A. No. 2981.

United States District Court,
W. D. North Carolina,
Charlotte Division.

Nov. 8, 1971.

Stanley A. Gertzman, Gertzman & Goldfarb, Charlotte, N. C., and Michael P. Mullins, Palmer, Jonas & Mullins, Charlotte, N. C., for plaintiffs.

Henry W. Underhill, Jr., W. A. Watts and Charles R. Buckley, III, Charlotte, N. C., for defendants.

## MEMORANDUM OF DECISION AND ORDER

McMILLAN, District Judge.

### SUMMARY

Charlotte, North Carolina authorities denied plaintiffs the use of the Charlotte municipal auditorium for performances of the Broadway play, "HAIR," although for fifteen years or more Broadway plays have been shown there without censorship. The refusal was not based on obscenity or other illegality; city attorneys advised that the play does not violate applicable laws. The denial can not be supported for financial reasons because it is conceded that "HAIR" if shown will be profitable and the apprehension that future financial losses may result is speculative only and is contrary to the only evidence on the subject, which is the experience of other Southern municipal auditoriums.

Under the United States Constitution, if some of the public are allowed to use a municipal facility, others may not be excluded merely because what they propose to do does not square with the personal opinions of a majority of the citizens or those of members of the controlling municipal board.

The defendants will be required to honor the tentative commitment of the Auditorium which the Auditorium manager has previously made.

### FINDINGS OF FACT

The evidence reveals the following:

Plaintiffs are theatrical promoters with rights to make bookings for the play "HAIR." Defendants include the City of Charlotte, its Mayor and Council, and the manager and members of the Charlotte Auditorium-Coliseum-Civic Center Authority.

The Auditorium seats about 2,500 and has adequate facilities for Broadway stage plays and other attractions, and is the only hall in Charlotte in which a road company could reasonably expect to play "HAIR" successfully.

In practice Paul Buck, the very competent manager, is in full charge of the Auditorium and Coliseum, including booking a wide variety of attractions, collecting rents, handling promotions, and other details. In the trade, commitments of a theatre for future shows are customarily made by telephone, and such commitments are usually honored. That is true of Buck's operation of the Auditorium. His bookings are subject to approval by the Authority. However, up until the question of "HAIR" was raised, Buck had booked all or nearly all of the successful Broadway plays of the past fifteen years into the Auditorium and for none before "HAIR" had he sought or required the express approval of the Authority.

The Authority exists by virtue of Chapter 5, Sections 21, 22 and 23 of the Charter of the City of Charlotte. Those sections vest "the control of the management and operation" of the Auditorium in the five-member Authority appointed by the City Council, and those members are charged with "the efficient administration of its affairs." Section 5–23 provides that:

"The Authority shall operate the auditorium-coliseum in a proper, efficient, economical, and business-like manner, to the end that such properties and facilities may effectively serve the public needs for which they were established at the least cost and expense to the City of Charlotte.

* * * The Authority shall have full and complete control of such auditorium-coliseum properties and facilities; shall make all reasonable rules and regulations as it deems necessary for the proper operation and maintenance of such properties and facilities; * * *."

No censorship powers have been given the Authority by the Charter or by the City Council.

No policies, rules or regulations, formal or otherwise, relating to censorship or standards to be observed by shows or by lessees of the Auditorium, have been adopted by the Authority or the Council.

No objective standards, written or otherwise, have been established to determine what events will or will not be allowed to be shown. In practice, the Authority members have relied upon Mr. Buck, the manager, for bookings, and have been content with his judgments.

No procedure exists for determining whether a proposed attraction is or is not obscene or otherwise unlawful or otherwise objectionable; and there is no method of affording a hearing to determine questions of obscenity or other illegality or other criteria of undesirability.

The Auditorium and Coliseum were constructed with the proceeds of municipal bond issues, the first of which was issued before construction started in the early 1950's. The bonds are not revenue bonds but are general obligation bonds of the municipality and they are paid by the taxpayers without regard to whether the Authority breaks even, makes a profit or loses money. In practice, the income from the Auditorium and Coliseum produces a modest surplus which is above actual cost of operation, but is not enough to pay any substantial part of the sizeable interest on the bonds and is not enough to help pay the principal of the bonds themselves.

In short, the Auditorium and Coliseum are tax supported, publicly operated, and publicly controlled activities.

In August, 1971, Robert Scherin, president of the plaintiffs, communicated with Mr. Buck about booking "HAIR." The plaintiff companies are financially and otherwise responsible within the Authority's usual expectations. Scherin has booked at least one previous play, "I DO, I DO," into the Auditorium. Mr. Scherin had several conversations with the city attorneys concerning (1) the legality of "HAIR" under obscenity statutes of North Carolina and ordinances of Charlotte; (2) the $500 "topless" tax of the City of Charlotte which has subsequently been held invalid by Judge W. K. McLean of the North Carolina Superior Court; and (3) other possible legal hurdles. These attorneys, by letter of October 4, 1971, advised the defendants that showing of "HAIR" would not violate any applicable statutes and ordinances. Mr. Buck, after the legal questions had been answered, advised Scherin that the Auditorium was available for November 18, 19, 20 and 21, 1971, subject to approval by the Authority itself. On the strength of this advice, and the customs of the booking trade, Scherin then, in early October, made a binding commitment with the producers of "HAIR" for a road company to show "HAIR" in the Auditorium on those dates.

Thereafter, on October 19, 1971, the Authority met and took a vote. The matters considered by the members, before, during and since the vote, were as follows:

(a) Availability of the hall. It was and is available.

(b) Whether the performance would violate any law or ordinance dealing with obscenity. The answer of the city attorneys was "No."

(c) Whether "HAIR"'s six-second, subdued-light, nude tableau could be eliminated. The producers declined to do that.

(d) Whether the nude actors would be willing to wear body stockings. The producers said "No."

(e) Whether there is another suitable place available in Charlotte. There is none.

(f) Whether the play would be profitable or unprofitable. It was agreed beyond question that "HAIR" would play to full or nearly full houses and that it would be profitable.

(g) What the effect would be upon the future "image" of the Auditorium. Members felt that it would disturb the "family entertainment" image which they thought they had maintained throughout the years. (The "family entertainment" image may not be entirely correct as a matter of history; the testimony indicates that "MAN OF LA MANCHA" with a rape scene and "ON A CLEAR DAY" with its bedroom scene have been shown in the Auditorium, and there is no evidence they have damaged any "family entertainment" image.)

(h) Future financial damage which showing a controversial play like "HAIR" might bring. There was no evidence what this damage would be, but only an apprehension that people might not continue to support the Auditorium. On this point, the evidence shows that in Richmond, Virginia; Jacksonville, Florida; Wheeling, West Virginia; and San Antonio, Texas, the play "HAIR" has been invited back for second runs in municipal auditoriums; that no serious boycott has ever been threatened; and that most of the problems involving "HAIR" have been similar to this one —advance apprehensions by authorities who had not seen the show.

(i) Whether the show should be excluded on other grounds. Mr. Arthur Newcombe, Chairman of the Authority, a person of eminent capacity, good will, good nature and ability, testified that he was no moralist and no stuffed-shirt, but that he just didn't like the idea of having the show in a public facility where children may attend. As he put it, the Authority was "trying to stem a moral tide rather than a legal tide."

(j) Public opinion. One member testified that he thought the Authority should do what a majority of people want, and that he thought a majority of people would not want "HAIR" to be shown.

(k) Some apprehension was expressed that since improvements in the Coliseum and Auditorium have to be financed by issuing bonds which require a public vote, and since some future capital expenses for accoustical improvements in the Auditorium and for enlargement in parking facilities may be necessary, this controversial play should not be shown because it might jeopardize future public support for such bond issues.

By a 3/2 vote on October 19, 1971, the members of the Authority decided not to approve the booking.

Thereafter, plaintiffs filed this action asking for temporary relief and requesting an order requiring the defendants to allow the showing of the play on the dates originally scheduled between the plaintiffs and Mr. Buck.

Robert Scherin, plaintiffs' president, testified that he had presented "HAIR" in three cities and has arrangements to present it in thirty-one more cities. It has played in 140 cities in the United States and Canada and in fourteen major capital cities in other parts of the world. Mr. Scherin (the only witness who appeared to have seen the play) says that it *does* itself teach valid moral lessons. It deals with current problems of racism, the Viet Nam war, pollution of the earth, drugs, sex and other problems of young people, and suggests that the country will be improved if we deal successfully with those problems. The much bruited nude scene is a type of tableau, a "live painting" which lasts about six seconds, is displayed in subdued light, and is described by Mr. Scherin as depicting the hoped-for rejuvenation of the youth of today. It contains no sexual suggestion or implications and no suggestive movement or action by the characters, he says.

On the question of harm to the plaintiffs, the evidence reveals that the plaintiffs have booked the play upon the reasonable assumption that, with the legal barriers cleared, Mr. Buck's reservation of the hall would be honored, according to usual practice. The estimated loss of profit to the plaintiffs from cancelling the showing would be between $16,000 and $20,000. Other and more serious losses from the cancellation would be the loss of reputation and possible liability for losses of the producers which the plaintiffs will sustain if they have to cancel the booking, or try to re-book the play elsewhere on such short notice; the possibility that if the road company has to remain idle for four days it might fold up because it might not be able to keep the players and retinue together; the likelihood that the actors would lose their pay and that the "HAIR" company itself would have large financial and other losses. A further consideration advanced is that where a play has been banned or censored in a community it creates fear or apprehension among producers about the future of the theatre in the community. (This last consideration may also indicate that the financial theatrical future of the Auditorium Authority would be better served by *showing* the play than by cancelling the booking.)

If the defendants were operating a private playhouse they would have the full right to select and reject any entertainment they chose.

In fact, the first reaction of many people, including the first reaction of this judge, is that the City as theatre proprietor should have the same right.

Like many first reactions, that one will not stand close scrutiny in light of the facts and the Constitution of the United States.

The defendants are operating the Auditorium in an efficient and public-spirited fashion. Their devotion to a high "tone" of entertainment and to the "family-type" motif is admirable.

Nevertheless, the Auditorium and Coliseum are public, tax-supported facilities and defendants operate them *as public servants rather than as private owners*, and in so doing are bound by constitutional standards of free speech, free expression, and equal protection of laws, even as those are bound who operate courts, other government agencies, and law enforcement agencies.

The basic objections to "HAIR" seem to have been legality, economy, and taste or personal judgments of the Authority members.

*Legality.* In operating a public facility the Authority, of course, must comply with statutes and ordinances prohibiting obscenity. It is agreed that the play does not violate obscenity statutes and ordinances of North Carolina or Charlotte; obscenity or other legality is not the reason for the decision of the Authority.

*Economy.* Money is a legitimate consideration. The Authority is required to proceed in a "proper, efficient, economical and business-like manner * * *." It is expected and entitled to charge rentals for the Auditorium and within constitutional bounds it must, of course, try to obtain suitable revenues and to have a weather eye toward the long range financial future of the operation.

However, it is absolutely clear from the evidence that "HAIR" is not likely to lose money if shown in Charlotte. Everybody agrees to that. It is also apparent that plays with unorthodox scenes have been shown in the Auditorium, and there is no evidence that they have adversely affected subsequent attendance or rentals or income. To the contrary, it appears that if censorship is asserted one likely effect is that producers and promoters may be discouraged from bringing plays to Charlotte. It also appears that the major costs to the community of having the Auditorium for community purposes (the obligations of the bonds) have already been incurred by the taxpayers, and are not de-

pendent on the market for Broadway plays or other entertainments; the bond issues and the interest on those bonds are paid by the taxpayers independent of Auditorium income. The apprehension as to the depressing effect of a showing of "HAIR" upon future income and future community support is speculative only, and the experience in other Southern communities as shown by the testimony refutes such speculative apprehension. Where "HAIR" has been shown in other Southern towns it has been a box office success, and it has been invited back to many municipal auditoriums.

*The taste or personal judgments of the Authority members.* What this comes down to is whether the Authority members have the power to disapprove a use of the Auditorium which, though lawful and profitable, is contrary to their own sincere personal ideas, or what they *think* are the community *standards,* of public behavior or acceptable taste.

It would be pleasant to say "Yes." The Hays office for years kept many people contented with the illusions of the motion picture "silver screen." However, motion pictures are usually shown in *privately* owned theatres. The Auditorium is a *public* facility. This, it must be remembered, is not only a distinction but a distinction with a legal and constitutional difference.

## THE LAW THAT GOVERNS

■■  The equal protection clause of the Fourteenth Amendment requires that the use of municipal facilities, if available to any of the public (see Palmer v. Thompson, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971)), must be available on equal terms to all similarly situated persons. (A corporation is a person within the meaning of the equal protection clause. Grosjean v. American Press Co., 297 U.S. 233, 244, 56 S.Ct. 444, 80 L.Ed. 660 (1936).) It has been held that municipal beaches (Mayor and City Council of Baltimore City, et al., v.

Dawson, et al., 220 F.2d 386 (4th Cir., 1955), affirmed, 350 U.S. 877, 76 S.Ct. 133, 100 L.Ed. 774 (1955)); golf courses (Holmes, et al. v. City of Atlanta, et al., 350 U.S. 879, 76 S.Ct. 141, 100 L.Ed. 776 (1955)); and parks (Watson, et al. v. City of Memphis, et al., 373 U.S. 526, 83 S.Ct. 1314, 10 L.Ed.2d 529 (1963)) must be available on equal terms to both white and black persons. In Niemotko v. Maryland, 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267, 280 (1951), where " * * * the use of, a park was denied [to the Jehovah's Witnesses] because of the City Council's dislike for or disagreement with the Witnesses or their views," the Supreme Court said (at 340 U.S. 272, 273, 71 S.Ct. 328):

> "The right to equal protection of the laws, in the exercise of those freedoms of speech and religion protected by the First and Fourteenth Amendments, has a firmer foundation than the whims or personal opinions of a local governing body. * * * [T]he completely arbitrary and discriminatory refusal to grant the permits was a denial of equal protection."

Discriminatory limitations on the use of sidewalks and streets for parades and assemblies (Cox v. Louisiana 379 U.S. 536 at 557–558, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965)), and the discriminatory administration of city ordinances regulating businesses (Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)) are also invalid under the equal protection clause.

■  The decision of the Authority not to approve the performance of "HAIR" in Ovens Auditorium was state action based essentially upon the Authority members' personal opinions and reservations regarding the content of the play. This basis for rejection, particularly in the context of a situation involving First Amendment rights (see *Niemotko, supra*) violates the equal protection clause of the Fourteenth Amendment.

■  As indicated in the reference above to *Niemotko,* more is involved

here than equal protection. An alternative ground for decision is the First Amendment. The First Amendment problem raised in this case is analogous to that problem in a long line of cases involving parade and demonstration permits, including the *Niemotko* and *Cox* cases cited above, and including Shuttlesworth v. Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969), in which the Supreme Court said:

"* * * '[W]e have consistently condemned licensing systems which vest in an administrative official discretion to grant or withhold a permit upon broad criteria unrelated to proper regulation of public places.' Kunz v. New York, 340 U.S. 290, 293–294 [71 S.Ct. 312, 95 L.Ed. 280]. See also Saia v. New York, 334 U.S. 558 [68 S.Ct. 1148, 92 L.Ed. 1574]; Niemotko v. Maryland, 340 U.S. 268 [71 S.Ct. 325, 95 L.Ed. 267, 280]. Even when the use of its public streets and sidewalks is involved, therefore, a municipality may not empower its licensing officials to roam essentially at will, dispensing or withholding permission to speak, assemble, picket, or parade, according to their own opinions regarding the potential effect of the activity in question on the 'welfare,' 'decency,' or 'morals' of the community."

The use of municipal auditoriums is subject to the same limitations on withholding permission for its use. The City, of course, has a right and duty to inquire into the financial responsibility of those who would use the Auditorium, and rejection of permission to use the facility on that basis is in no way limited by this decision. However, neither this distinction nor the fact that *Shuttlesworth* and the other cases cited above arose in the context of criminal prosecutions, relieve the Authority's rejection of bookings from the applicability of the principles of those cases. See also East Meadow Community Concerts Association v. Board of Education, 19 N.Y.2d 605, 278 N.Y.S.2d 393, 224 N.E.2d 888 (1967) (New York Court of Appeals dis-

approved refusal to allow Pete Seeger performance in high school auditorium).

Perhaps the most eloquent and comprehensive statement of the pertinent principles is that of the eminent Chief Justice Traynor, of the Supreme Court of California in Danskin v. San Diego Unified School District, 28 Cal.2d 536, 171 P.2d 885 (1946), holding that municipal authorities could not validly prohibit nor attach special conditions to use of a school auditorium by the local Civil Liberties Union for some meetings which the board disapproved of. Justice Traynor said:

"The convictions or affiliations of one who requests the use of a school building as a forum is of no more concern to the school administrators than to a superintendent of parks or streets if the forum is the green or the market place. The ancient right to free speech in public parks and streets cannot be made conditional upon the permission of a public official, if that permission is used as an 'instrument of arbitrary suppression of free expression.' Hague v. CIO, 307 U.S. 496, 516, 59 S.Ct. 954, 964, 83 L.Ed. 1423; In re Porterfield, 28 Cal.2d 91, 168 P.2d 706. It is true that the state need not open the doors of a school building as a forum and may at any time choose to close them. Once it opens the doors, however, it cannot demand tickets of admission in the form of convictions and affiliations that it deems acceptable. Censorship of those who would use the school building as a forum cannot be rationalized by reference to its setting. School desks and blackboards, like trees or street lights, are but the trappings of the forum; what imports is the meeting of minds and not the meeting place." [171 P.2d 885, 892.]

Most pertinent in terms of its recency and authoritative nature is the March 11, 1971 decision by Judge James Braxton Craven, Jr., of the Circuit Court of Appeals for the Fourth Circuit, in United States Servicemen's Fund v. Shands, 440 F.2d 44. The Cumberland County,

North Carolina Memorial Auditorium authorities refused to allow a show which included Jane Fonda, Dick Gregory and Elliot Gould in an anti-Viet Nam war performance. Authorities contended that this would disturb "pleasant community relations" and that since a large Army base, Fort Bragg, is so close to the auditorium there might be violence or other disturbance which might be impossible to control.

Judge Craven, for whose opinions this court has great respect, said, in directing that the auditorium be made available:

"It is much too late in the history of the First Amendment to seriously suggest that public officials managing a public facility may pick and choose the philosophical and ideological content of programs using public auditoriums. Shuttlesworth v. Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed. 2d 430 (1969). Defendants, however, insist that the plaintiffs have no right to pick a given date and insist upon it. I agree, but there is more to it than that. Plaintiffs sought this particular date more than five weeks prior to the event, and Shands clearly indicated that the auditorium was available at that time and negotiated for the rental of it. * * * Denying permission to put on plaintiffs' show when permission was sought some five weeks ago and schedules made at least that long ago amounts, in my opinion, to irreparable injury when it is not shown that another date or another auditorium or meeting place can be readily substituted."

This court is aware that a United States District Judge in Florida recently held that West Palm Beach could deny its municipal auditorium to "HAIR." Southeastern Promotions, Ltd., et al., v. City of West Palm Beach, Florida, et al., No. 71-1461—Civ-EC, United States District Court for the Southern District of Florida, October 22, 1971. The decision seems to rely considerably upon the Court's suspicion that "HAIR" is obscene. However, neither the reasoning of that decision nor the result it reaches is consistent with the equal protection and free speech and freedom of expression principles of the United States Constitution, nor with the other decisions previously discussed; and at least two other courts have reached decisions favorable to the showing of this particular play. These are the United States District Court for the Eastern District of Arkansas (Southwest Productions, Inc. v. Freeman, No. LR–71–C–137, August 13, 1971), and the Circuit Court of the City of St. Louis, Missouri, Division 3 (Southeastern Promotions, Ltd. et al. v. Alphonso J. Cervantes, et al., October 20, 1971).

## CONCLUSION

■■ The Constitution of the United States (in the absence of a recognized contrary reason such as properly determined obscenity, clear and present danger, genuine financial hardship) contemplates that public facilities be available equally to all persons similarly situated, without restraint upon freedom of speech and expression. Persons in public authority must respect the constitutional guarantees of equal protection of laws and of free speech and expression.

■ When issues of equal protection, free speech and freedom of expression are presented, the burden in case of doubt should be not upon those who "shout freedom" but upon those who as public officials would restrict it.

No substantial probable harm to defendants has been shown if the relief sought is granted.

The harm to the plaintiffs if relief is denied is great and irreparable and the remedy in money damages is imponderable and inadequate.

The plaintiffs are entitled to show the play "HAIR" in the Auditorium.

The defendants are directed to make the Auditorium available to plaintiffs on November 18, 19, 20 and 21, 1971, as originally arranged with Mr. Buck.