**SOUTHEASTERN PROMOTIONS, INC.**

v.

**Steve CONRAD et al.**

**Civ. A. No. 6379.**

United States District Court,
E. D. Tennessee, S. D.

April 7, 1972.

John Alley and Michael M. Raulston, Chattanooga, Tenn., for plaintiff.

Eugene Collins and Randall L. Nelson, Chattanooga, Tenn., for defendants.

## MEMORANDUM

FRANK W. WILSON, Chief Judge.

The plaintiff, Southeastern Promotions, Inc., seeks by this action to obtain a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 regarding the plaintiff's right to lease a municipal theater or auditorium for use in presenting a commercial theatrical production known as "Hair." Jurisdiction is averred to be based upon 28 U.S.C. §§ 1332 and 1343(3) (4). The plaintiff seeks by way of relief a mandatory injunction requiring the defendants, as members of the Municipal Auditorium Board for the City of Chattanooga, Tennessee, to lease the theater or auditorium under its management to plaintiff for a specific date, the specific date now sought being Sunday, April 9, 1972, four days from the date upon which the trial in the case was concluded.

By way of response the defendants filed a motion seeking a dismissal of the complaint upon the grounds that (1) the plaintiff was without standing to maintain the lawsuit, (2) the defendants, acting in a proprietary rather than governmental capacity, cannot be required to lease the theater facility under their management, (3) the theatrical production sought to be presented by the plaintiff would violate both the ordinances of the City of Chattanooga and the laws of the State of Tennessee and would be in violation of Paragraph (1) of the standard lease requiring compliance with such laws (Exhibit No. 3), (4) the plaintiff, being a corporation and not a natural person, would have no right to maintain this action, and (5) the complaint fails to allege a cause of action.

In order to expedite the hearing of this case, action on the motion to dismiss was reserved and the defendants were ordered to file an answer. In their answer, and among other matters, the defendants contended that the theatrical production "Hair" was a violation of municipal ordinances and state laws prohibiting nudity and obscenity in public places. A trial was held upon all issues, with the issue of obscenity being tried to an advisory jury pursuant to Rule 39 (c), Federal Rules of Civil Procedure. The jury returned a verdict finding the theatrical production "Hair" obscene within the meaning of obscenity as that term relates to freedom of speech as secured by the First Amendment and further found conduct on the part of actors apart from any speech or conduct in expression of speech (symbolic speech) to be obscene conduct.

The case is now before the Court for decision of all issues raised in the plaintiff's complaint, the defendants' motion to dismiss, the defendants' answer, the record made upon the trial of the case, the advisory verdict of the jury, and the argument of counsel. By order of the Court, and without objection of the parties, the trial of this case was held shortly after the filing of the answer and this memorandum is being written immediately upon the conclusion of the trial and under the necessity of its immediate entry if the plaintiff is to have the requested date of showing four days from this date. This opinion will serve as the Court's findings of fact and conclusions of law.

The plaintiff, Southeastern Promotions, Inc., is a corporation organized under the laws of the State of New York and with its principal offices in New York City. It is engaged in the business of presenting commercial theatrical productions and has contractual relations giving it presentation rights with the theatrical group that owns and produces a theatrical production known as "Hair" and described as a "rock musical." The defendants are the duly appointed and acting members of a municipally created body known as the Board of Directors of the Memorial Auditorium. They were appointed pursuant to an ordinance of the City of Chattanooga, Tennessee, and are charged with the management and operation of the Memorial Auditorium, a municipally owned auditorium, and the Tivoli Theater, a former motion picture theater privately owned and now under lease to the City of Chattanooga.

The plaintiff has made three previous requests of the defendants for lease of the Tivoli Theater but upon each occasion the request was denied. Following the last denial this lawsuit was filed upon November 1, 1971. A hearing upon a preliminary injunction in advance of any response by the defendants was held at that time and the injunction denied. By amendment to its complaint filed March 23, 1972, the plaintiff now seeks a mandatory injunction permitting it to lease the municipal auditorium for the presenting of its theatrical production "Hair" upon the date of Sunday, April 9, 1972. No issue exists in the case but that the municipal auditorium is not scheduled for other use on that date or that the plaintiff cannot meet the conditions of the standard lease form regularly used by the defendants in leasing of the municipal auditorium other than that condition of the lease relating to compliance with the laws of the State of Tennessee and of the City of Chattanooga.

## Motion to Dismiss

Turning first to the defendants' motion to dismiss, as previously stated, that motion is predicated upon a denial of standing on the part of the plaintiff corporation to maintain this action, a denial of any duty upon the defendants while acting in a proprietary capacity to lease the municipal facilities under its management, an averment of the plaintiff's inability to comply with the lease requirement that local and state law will not be violated, an averment that the plaintiff, being a corporation and not a natural person, would have no right to maintain this action, and a general averment that the complaint fails to aver any substantial federal question or constitutional issue.

■ With regard to the plaintiff's standing to maintain this litigation, it is the defendants' contention that the plaintiff does not propose to make any expression or theatrical presentation itself, but rather is only a booking agent having at most only a commercial interest in the presentation of "Hair." It is contended that no right of the plaintiff to freedom of speech is involved. Citing the rule that only those whose federal constitutional rights are alleged to be involved have standing to seek judicial adjudication of those rights, the defendants deny any standing in the plaintiff to assert a First Amendment violation in this lawsuit. While the undisputed evidence now bears out that the plaintiff's interest in the lawsuit is a commercial one as booking agent and promoter, and not as an owner or performer, the testimony being that it expects to net $10,000 off of a single performance in Chattanooga, the issue of standing to sue would appear to be resolved in favor of the plaintiff by the United States Supreme Court in the case of Flast v. Cohen, 392 U.S. 83, 88 S. Ct. 1942, 20 L.Ed.2d 947 (1968) wherein the Court stated:

> "The 'gist' of the question of standing' is whether the party seeking relief has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions' (citations omitted)."

As stated elsewhere in that opinion, "The question of standing (i. e., in terms of constitutional limitation) is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." When viewed in light of these principles, it is apparent that the defendants' motion to dismiss for lack of standing on the part of the plaintiff to maintain this action must be denied.

■ It is next contended that although the defendant Board is a municipally created board with responsibility for management of municipally owned or leased theater and auditorium facilities, the Board's activities in this regard are of a proprietary and not of a governmental nature. It is therefore contended that leasing or not leasing these facilities is entirely optional with the Board, as

would be true with a private owner. The defendants cite the following authorities in support of this proposition: Avins v. Rutgers State University of New Jersey, 3 Cir., 385 F.2d 151 (1967); Warren v. Bradley, 39 Tenn.App. 451, 284 S.W.2d 698 (1955); City of Knoxville v. Heth, 186 Tenn. 321, 210 S.W.2d 326; Miami Beach Airline Service v. Crandon, 159 Fla. 504, 32 So.2d 153; State ex rel. v. Newton, 3 Tenn.Civ.App. 93 (1912); State of Washington ex rel. Tubbs v. City of Spokane, 53 Wash.2d 35, 330 P.2d 718 (1958); State of Ohio ex rel. White v. City of Cleveland, 125 Ohio St. 230, 181 N.E. 24, 86 A.L.R. 1172; 56 Am.Jur. 2d "Municipal Corporations" § 556; and Southeastern Promotions, Ltd. v. City of Oklahoma, (Civil Action No. 72–105, D.C.W.D.Okl., Decided March 27, 1972). Generally speaking, the foregoing line of cases deals with the distinction between proprietary and governmental action and reason by analogy that proprietary action by a governmental body is to be judged by the same rules governing private proprietary action. While this line of reasoning by analogy may appear on the surface to have validity, the analogy breaks down under more careful examination. It would appear that the defendant Board in this case does act in a proprietary capacity in its management of its theater and auditorium facilities. However, whether the Board is acting in a proprietary capacity or in a governmental capacity, it is apparent that it remains a public body. It is further apparent that as a public body it could not allow men to use the auditorium but refuse under like circumstances to permit women to use it solely because they were women. It is apparent that the defendant Board could not permit persons of one religious persuasion to use the auditorium but under like circumstances refuse to permit those of another religious persuasion to use it solely because they were of another religious persuasion. The same would be true if the Board sought to discriminate upon the basis of race or national origin. Accordingly, it is apparent that whether the Board acts in a governmental capacity or in a proprietary capacity it nevertheless remains a public body, and as such it cannot differentiate or discriminate where the sole basis of that differentiation or discrimination is for some constitutionally impermissibe reason. This is tacitly recognized even in the defendants' last cited case above, the recent and unreported decision of Southeastern Promotions, Ltd. v. City of Oklahoma, *supra*, wherein the Court stated, "It follows that the first part of numbered paragraph 8 of the lease contract governing the use of the Civic Music Center Hall is valid in that defendants are within their rights to decline to contract with exhibitors so long as they do not act arbitrarily."

While the Auditorium Board may lawfully deny use of its facilities unto all persons, or unto all persons for certain reasonably distinguishable types of activity, it cannot permit its use for a purpose to one person and deny its use for the same purpose to another person solely for a constitutionally impermissible reason, as for example to deny the latter person his right to freedom of speech. By way of illustration, if obscenity were the only reason advanced by the Board for denying use of its facilities and that contention of obscenity is not sustainable in fact and in law, the denial then becomes one for the constitutionally impermissible reason of denial of freedom of speech and the denial of a lease under such circumstances cannot stand.

■ The third ground in the defendants' motion to dismiss, namely that the theatrical production for which a lease is sought by the plaintiff would violate both ordinances of the City of Chattanooga and laws of the State of Tennessee relating to both public nudity and obscenity, raises issues of both fact and law which can only be decided after a trial on the merits of these contentions. These matters will accordingly be considered in the portion of this opinion dealing with the trial of the case on its merits.

■ The fourth ground in the defendants' motion to dismiss is the allegation

that the plaintiff, being a corporation, cannot maintain this action. In support of this ground the defendants rely upon the case of Hague v. Committee for Industrial Organization, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423, wherein the Court stated:

"Natural persons, and they alone, are entitled to the privileges and immunities which Section 1 of the Fourteenth Amendment secures for 'citizens of the United States.' Only the individual respondents may, therefore, maintain this suit."

The holding in the foregoing case is inapplicable to the allegations in this case for the reason that the constitutional rights here claimed are due process, equal protection of the laws, and freedom of speech, and do not arise under the privileges and immunities clause. Corporations are considered persons within the provisions of the constitutional guarantees of due process, equal protection and freedom of speech. See Grosjean v. American Press Company, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660. The fourth ground of the motion to dismiss will likewise be denied.

■ The fifth and final ground in the defendants' motion to dismiss is that the complaint fails to allege a federal question issue in that the defendants have not denied the plaintiff's right to speak, but at most have only denied the use of a particular forum in which to speak. It is apparent that this contention is without merit if in fact, as alleged by the plaintiff, the defendants have acted so as to deny the plaintiff equal protection of the laws, due process, and freedom of speech.

### Trial on the Merits

Turning to the merits of this lawsuit, the pleadings raise essentially the issue of whether the defendant Board acted within its lawful discretion in declining to lease its theater and/or auditorium facility to the plaintiff for the reason that the plaintiff's theatrical production "Hair" would violate Paragraph (1) of the standard lease form requiring the lessee to comply with all state and local laws in its use of the leased premises. More specifically, the issue presented by the pleadings is whether the theatrical production "Hair" would violate any constitutionally valid provision of the common law of Tennessee relating to indecent exposure, gross indecency, or lewdness or would violate any constitutionally valid provision of City ordinances and State statutes which, among other matters, purport to make public nudity and obscene acts criminal offenses.[1]

---

1. *Chattanooga Code*
Sec. 25–28. *Indecent exposure and conduct.* It shall be unlawful for any person in the city to appear in a public place in a state of nudity, or to bathe in such state in the daytime in the river or any bayou or stream within the city within sight of any street or occupied premises; or to appear in public in an indecent or lewd dress, or to do any lewd, obscene or indecent act in any public place.
Sec. 6–4. *Offensive, indecent entertainment.* It shall be unlawful for any person to hold, conduct or carry on, or to cause or permit to be held, conducted or carried on any motion picture exhibition or entertainment of any sort which is offensive to decency, or which is of an obscene, indecent or immoral nature, or so suggestive as to be offensive to the moral sense, or which is calculated to incite crime or riot.

*Tennessee Code Annotated*
Sec. 39–3003.—It shall be a misdemeanor for any person to knowingly sell, distribute, display, exhibit, possess with the intent to sell, distribute, display or exhibit; or to publish, produce, or otherwise create with the intent to sell, distribute, display or exhibit any obscene material

. . .

\* \* \* \* \*

The word "person" as used in this section shall include the singular and the plural and shall also mean and include any person, firm, corporation, partnership, copartnership, association, or any other organization of any character whatsoever.
Sec. 39–1013. *Sale or loan of material to minor—Indecent exhibits.* It shall be unlawful:
(a) for any person knowingly to sell or loan for monetary consideration or otherwise exhibit or make available to a minor:
(1) any picture, photograph, drawing,

This case, involving as it does the First Amendment right to freedom of speech, and the statutes and ordinances cited in the footnote asserting obscenity as a prohibited criminal offense, the issue of obscenity was severed for trial from other issues in the case and this issue was tried before the Court sitting with an advisory jury pursuant to Rule 39(c), F.R.C.P. The evidence upon the trial of the obscenity issue consisted of the full script and libretto with production notes and stage instructions (Exhibit No. 4), a recording of the sound tract of all musical numbers in the production (Exhibit No. 7), and a souvenir program (Exhibit No. 1). In addition there was received the testimony of seven witnesses who had witnessed the production "Hair," including two witnesses who attended a performance two days previous to their testimony, and an eighth witness who had not seen the production but had read the script and gave his interpretation as a drama critic. Following the completion of the evidence and the argument of counsel, the issue of obscenity was submitted to the jury upon instructions of the Court upon the issue of obscenity, as set forth in an appendix to this opinion.

After deliberation the jury returned the following verdict:

(1) We, the jury, find the theatrical production "Hair" to be *obscene* in accordance with the definition of obscene as it relates to freedom of speech under the First Amendment of the United States Constitution.

(2) We, the jury, find the theatrical production "Hair" to be *obscene* in accordance with the definition of obscenity as it relates to conduct.

After discharge of the jury further evidence was received by the Court upon issues other than obscenity, such evidence being principally with regard to the action of the Board in denying a lease of its facilities to the plaintiff and the standard form of lease required to be executed by all lessees (Exhibit No. 3). Following further argument of counsel the case was submitted to the Court upon the foregoing record.

*Findings of Fact*

Turning first to the issue of obscenity, the script, libretto, stage instructions, musical renditions, and the testimony of the witnesses reflect the following relevant matters (It should be noted that the script, libretto, and stage instructions do not include but a small portion of the conduct hereinafter described as occurring in the play):

The souvenir program as formerly distributed in the lobby (Exhibit No. 1) identified the performers by picture and biographical information, one female performer identifying herself as follows:

"Hobbies are picking my nose, fucking, smoking dope, astro projection. All that I am or ever hope to be, I owe to my mother."

It was testified that distribution of this program had now been discontinued. Prior to the opening of the play, and to the accompaniment of music appropriate to the occasion, a "tribe" of New York "street people" start gathering for the commencement of the performance. In view of the audience the performers sta-

sculpture, motion picture film, or similar visual representation or image of a person, or portion of the human body, which depicts nudity, sexual conduct, excess violence, or sado-masochistic abuse, and which is harmful to minors;
(2) any book, pamphlet, magazine, printed matter, however reproduced, or sound recording, which contains any matter enumerated in paragraph (1) hereof above, or which contains explicit and detailed verbal descriptions or narrative accounts of sexual excitement, sexual conduct, ex-

cess violence, or sado-masochistic abuse, and which is harmful to minors;
(b) for any person knowingly to exhibit to a minor for a monetary consideration, or knowingly to sell to a minor an admission ticket or pass or otherwise to admit a minor to premises whereon there is exhibited a motion picture, show or other presentation which, in whole or in part, depicts nudity, sexual conduct, excess violence, or sado-masochistic abuse, and which is harmful to minors.

tion themselves in various places, some mingling with the audience, with a female performer taking a seated position on center stage with her legs spread wide to expose to the audience her genital area, which is covered with the design of a cherry. Thus the stage is set for all that follows. The performance then begins to the words and music of the song "Aquarius," the melody of which, if not the words, have become nationally, if not internationally, popular, according to the evidence. The theme of the song is the coming of a new age, the age of love, the age of "Aquarius." Following this one of the street people, Burger, introduces himself by various prefixes to his name, including "Up Your Burger," accompanied by an anal finger gesture and "Pittsburger," accompanied by an underarm gesture. He then removes his pants and dressed only in jockey shorts identifies his genitals by the line, "What is this God-damned thing? 3,000 pounds of Navajo jewelry? Ha! Ha! Ha!" Throwing his pants into the audience he then proceeds to mingle with the audience and, selecting a female viewer, exclaims, "I'll bet you're scared shitless."

Burger then sings a song, "Looking For My Donna," and the tribe chants a list of drugs beginning with "hashish" and ending with "Methadrine, Sex, You, WOW!" (Exhibit No. 4, p. 1–5) Another male character then sings the lyric.

"SODOMY, FELLATIO, CUNNILINGUS, PEDERASTY—FATHER, WHY DO THESE WORDS SOUND SO NASTY? MASTURBATION CAN BE FUN. JOIN THE HOLY ORGY, KAMA SUTRA, EVERYONE." (Exhibit No. 4, p. 1–5)

The play then continues with action, songs, chants, and dialogue making reference by isolated words, broken sentences, rhyme, and rapid changes to such diverse subjects as love, peace, freedom, war, racism, air pollution, parents, the draft, hair, the flag, drugs, and sex. The story line gradually centers upon the character Claude and his response and the response of the tribe to his having received a draft notice. When others suggest he burn his draft card, he can only bring himself to urinate upon it. The first act ends when all performers, male and female, appear nude upon the stage, the nude scene being had without dialogue and without reference to dialogue. It is also without mention in the script. Actors simulating police then appear in the audience and announce that they are under arrest for watching this "lewd, obscene show."

The second act continues with song and dialogue to develop the story of Claude's draft status, with reference interspersed to such diverse topics as interracial love, a drug "trip," impersonation of various figures from American history,[2] religion, war, and sex. The play ends with Claude's death as a result of the draft and the street people singing the song, "Let the Sunshine In," a song the testimony reflects has likewise become popular over the Nation.

Interspersed throughout the play, as reflected in the script, is such "street language" as "ass" (Exhibit No. 4, pp. 1–20, 21 and 2–16), "fart" (Exhibit No. 4, p. 1–26), and repeated use of the words "fuck"[3] and the four letter word

2. Lincoln is regaled with the following lyrics: "I's free now thanks to you, Massa Lincoln, emancipator of the slave, yeah, yeah, yeah! Emanci—mother fucking—pater of the slave, yeah, yeah, yeah! Emanci—mother fucking—pater of the slave, yeah, yeah, yeah!" With Lincoln responding, "Bang my ass . . . I ain't dying for no white man!"

3. A woman taking her departure says to the tribe, "Fuck off, kids." (Exhibit No. 4, p. 1–35). The following dialogue occurs as Claude nears his death scene:

"Burger: I hate the fucking world, don't you?
"Claude: I hate the fucking world, I hate the fucking winter, I hate these fucking streets.
"Burger: I wish the fuck it would snow at least.
"Claude: Yeah, I wish the fuck it would snow at least.
"Burger: Yeah, I wish the fuck it would.
"Claude: Oh, fuck!
"Burger: Oh, fucky, fuck, fuck!" (Exhibit No. 4, p. 2–22)

for excretion (Exhibit No. 4, pp. 1–7, 9 and 41). In addition, similar language and posters containing such language were used on stage but not reflected in the script.

Also, throughout the play, and not reflected in the script, are repeated acts of simulated sexual intercourse. These were testified to by every witness who had seen the play. They are often unrelated to any dialogue and accordingly could not be placed with accuracy in the script. The overwhelming evidence reflects that simulated acts of anal intercourse, frontal intercourse, heterosexual intercourse, homosexual intercourse, and group intercourse are committed throughout the play, often without reference to any dialogue, song, or story line in the play. Such acts are committed both standing up and lying down, accompanied by all the bodily movements included in such acts, all the while the actors and actresses are in close bodily contact. At one point the character Burger performs a full and complete simulation of masturbation while using a red microphone placed in his crotch to simulate his genitals. The evidence again reflects that this is unrelated to any dialogue then occurring in the play. The evidence further reflects that repeated acts of taking hold of other actors' genitals occur, again without reference to the dialogue. While three female actresses sing a song regarding interracial love, three male actors lie on the floor immediately below them repeatedly thrusting their genitals at the singers. At another point in the script (Exhibit No. 4, p. 2–22) the actor Claude pretends to have lost his penis. The action accompanying this line is to search for it in the mouths of other actors and actresses.

In support of the non-obscenity of the play "Hair" the plaintiff relies upon the contention that the simulated sexual acts consume only a small portion of the total performance time, that the nudity scene is brief and in reduced lighting, that the audience by attending consents to the play, that the play has been a financial success second only to the musical "Oklahoma," that the play has been performed in over 140 cities, that the music from the play has been upon the "Hit Parade," and that four other courts have found the play not to be obscene. Southeastern Promotions, Ltd. v. City of Atlanta, D.C., 334 F.Supp. 634 (1971); Southeastern Promotions, Ltd. v. City of Charlotte, D.C., 333 F.Supp. 345 (1971); P. B. I. C., Inc. v. Byrne, D.C., 313 F. Supp. 757 (1970); and Southwest Productions, Inc. v. Freeman, (U.S.D.C. E.D.Ark., 1971).[4]

### Obscenity

■ The definition of legal obscenity as it relates to the First Amendment guarantee of freedom of speech is defined in the case of Roth v. United States (1957) 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498, reh. den., 355 U.S. 852, 78 S.Ct. 8, 2 L.Ed.2d 60. The definition of obscenity in *Roth* is further amplified in Manual Enterprises, Inc. v. Day, 370 U.S. 478, 82 S.Ct. 1432, 8 L.Ed.2d 639. Although there have been numerous intervening cases in the Supreme Court dealing with obscenity, the *Roth* test of obscenity has been reaffirmed as recently as the case of Rabe v. Washington, 405 U.S. 313, 92 S.Ct. 993, 31 L.Ed. 2d 258 (Decided March 20, 1972). Having set forth that definition in the Court's charge to the jury as set forth in the appendix to this opinion, the Court will here include only a summary statement of the rule as taken from the charge.

4. This Court has no knowledge of the facts before the courts in any of the cited cases, for they make little in the way of findings of fact. Furthermore, it is apparent from the evidence in this case that the manner of presentation of "Hair" is substantially modified from time to time and place to place. The version of the play upon which the findings of fact have been made by this Court was that presented two days before the trial and five days before the writing of this opinion.

"Thus, by way of summing up, before the theatrical production here in issue can be found to be legally obscene, these elements must coalesce; It must be established, first, that the dominant theme of the material taken as a whole appeals to a prurient interest in sex; and, second, that the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and, third, that the material is utterly without redeeming social value."

Suffice it to say that the United States Supreme Court, unlike the English courts, does not permit the judging of a theatrical production in relevant portions in determining obscenity for the purposes of determining First Amendment freedom of speech rights. Rather, it is required that the production be judged as a whole and that it be granted First Amendment protection unless, among other matters, the production, when judged as a whole, is "utterly without redeeming social value." The latter concept has been interpreted with great strictness by the Supreme Court, with strong emphasis being placed upon the word "utterly." Furthermore, the Supreme Court has recently granted First Amendment protection to vulgar words similar to those here used. Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). Even apart from this, this Court could readily find, as did the jury, that substantial portions of the plaintiff's production is "utterly without redeeming social value." When required to view the production as a whole, however, including the music and those portions of the play that are not obscene, but at most only controversial, the Court cannot state that as a whole it is "utterly" without redeeming social value.

■ Obscenity, however, as it relates to theatrical productions, can consist of either speech or conduct or a combination of the two. It is clear to this Court that conduct, when not in the form of symbolic speech or so closely related to speech as to be illustrative thereof, is not speech and hence such conduct does not fall within the freedom of speech guarantee of the First Amendment. These matters were dealt with by the United States Supreme Court in the case of United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). That case arose out of the burning of draft cards at an anti-war demonstration. The issue presented was whether a federal statute making the knowing destruction or mutilation of a draft card a crime was an unconstitutional infringement upon the accused's right of freedom of speech. The Court, in upholding the statute from constitutional attack, stated:

"We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea. However, even on the assumption that the alleged communicative element in O'Brien's conduct is sufficient to bring into play the First Amendment, it does not necessarily follow that the destruction of a registration certificate is constitutionally protected activity. This Court has held that when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms. To characterize the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: compelling; substantial; subordinating; paramount; cogent; strong. Whatever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged

First Amendment freedoms is no greater than is essential to the furtherance of that interest. . . "

■ It is further clear to this Court that conduct not within the First Amendment is not subject to the requirement that the production in which it takes place be judged as a whole, but rather that the conduct may be judged obscene or nonobscene on the basis of individual acts of conduct. It is abundantly clear that if a crime other than the crime of obscenity were committed upon the stage, the actor committing that crime could neither claim First Amendment protection nor could he require that he be judged criminal or noncriminal on the basis of the production as a whole. If a murder, rape, mayhem or crime of assault were committed upon the stage, the actor perpetrating the same could claim no First Amendment protection, nor could he require that the theatrical production as a whole be reviewed in determining the criminality of his conduct. Accordingly, it must be that when the crime of obscenity is committed upon the live stage by conduct and not by speech, or symbolic speech, no First Amendment protection attaches to that conduct and no First Amendment requirement attaches that requires the production as a whole to be reviewed in determining such criminal obscenity.

This Court is aware that a district judge dealt differently with this issue in the case of Southeastern Promotions, Ltd. v. City of Atlanta, D.C., 334 F.Supp. 634 (1971) cited above. The Court there held that a stage production cannot be disected into speech and nonspeech components. The fallacy of that position is readily apparent, however, if any crime other than the crime of obscenity were committed in the course of a live stage production. That Court would doubtless have no difficulty in disecting speech and nonspeech components if the crime committed on the stage were the crime of rape or homicide, even though called for in the script. It is a false and dangerous doctrine that the First Amend-

ment forbids all regulation of conduct so long as that conduct masquerades under the guise of the theatrical. This Court respectfully declines to follow the rule set forth by the district judge in the Atlanta case. The same fallacy attaches to each of the cases relied upon by the plaintiff in prior adjudications of the theatrical production "Hair."

■ When viewed in their component parts, it is perfectly clear that the actors and actresses in the theatrical production "Hair," by their conduct, and apart from any element of speech, commit repeated acts of criminal obscenity that would be in violation of the ordinances of the City of Chattanooga and the statutes of the State of Tennessee forbidding acts of obscenity in public places. The Municipal Auditorium is a public place and the committing of live acts of simulated sexual intercourse, masturbation and mixed group nudity upon the stage before a live audience appeals to the prurient interest in sex, is patently offensive because it affronts contemporary community standards, both state and national, relating to the representation of sexual matters, and it is utterly without redeeming social value.

■ As regards the plaintiff's contention that the relative brevity of the sexual conduct in proportion to the total time of the play and the reduction of lighting on the scene of mixed group nudity relieves the conduct of its obscene character, these matters obviously constitute no defense to a charge of obscene conduct. These matters, on the contrary, are but proof of the plaintiff's own awareness of the obscenity of the conduct, as further evidenced by the use of an actor policeman to announce to the audience at the conclusion of the first act that they are under arrest for watching this "lewd, obscene show." Instantaneous murder is no less a crime than slow poisoning. A dimly visible robbery is no less a crime than a well lighted one. Unlawful conduct is not rendered lawful by the wattage of the light bulb in which it is committed. Nor

is it any defense that the acts other than nudity were simulated acts of sexual conduct. Simulated sexual acts are in themselves sexual conduct. Pregnancy does not have to result to establish sexual conduct.

 Likewise without merit is the plaintiff's contention that its performance is protected from regulation in that it is performed before a consenting audience. If audience consent were the test of First Amendment protection, then cock fights, bull fights, and Roman gladiatorial contests could no longer be regulated or forbidden by law.

As regards the constitutional validity of the ordinances and statutes relied upon by the defendants, insofar as those ordinances and statutes make obscenity as hereinabove defined a crime, there can be no doubt of their validity. As stated in Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954):

"Public safety, public health, morality, peace and quiet, law and order—these are some of the more conspicuous examples of the traditional application of the police power to municipal affairs. Yet they merely illustrate the scope of the power and do not delimit it."

 Undisciplined sex is one of the most destructive forces in any society and has historically been so recognized. It is destructive of many human values and institutions, not the least of which is the family, which in turn has served as the foundation for every civilization yet known to man. Regulation of public and undisciplined sexual conduct is clearly within the police power of the state.

 It is likewise equally clear that the obscenity laws relied upon by the defendants, as they relate to obscene conduct, meet the other standards laid down in United States v. O'Brien, *supra.* They further an important or substantial governmental interest, that is the suppression of public and undisciplined sexual conduct, and the protection of public morality and welfare. Their purpose is unrelated to the suppression of free speech, or, at most, they impinge upon the First Amendment freedom no more than is essential to the furtherance of that governmental interest.

 As regards the ordinance forbidding nudity in public places, that, too, can meet the standards for the exercise of police power as laid down in United States v. O'Brien, *supra,* particularly when applied to mixed group nudity upon the live stage, as occurs in the theatrical production here involved. Mixed group public nudity may become the accepted community standard in this Nation. But if it does, it should be by legislative approval, not by judicial fiat in the face of legislative action to the contrary.

 This Court is accordingly of the opinion that the theatrical production "Hair" contains conduct, apart from speech or symbolic speech, which would render it in violation of both the public nudity ordinances of the City of Chattanooga and the obscenity ordinances and statutes of the City and of the State of Tennessee. The defendants accordingly acted within their lawful discretion in declining to lease the Municipal Auditorium or the Tivoli Theater unto the plaintiff.

In conclusion, it is not inappropriate to note that musical, literary, and dramatic ability are scarce talents. Vulgarity, nudity, and obscenity are abundant and readily available commodities. All are good box office. The temptation to substitute the latter commodities for the former talents has become well nigh irresistible in the entertainment world in recent years. "Hair" found musical talent. It combined it with vulgarity, nudity, and obscenity to come up with a box office hit.

An order will enter dismissing this lawsuit.

## JURY INSTRUCTIONS
## APPENDIX

This case has its basis in the First Amendment of the Constitution of the United States. You will recall that

when I summarized for you the contentions of the parties, I advised you that the plaintiff was making the contention that the defendants had discriminated against the plaintiff by denying the plaintiff a lease upon the Tivoli Theater and/or the Municipal Auditorium, and that the denial of such lease was in fact and in law a denial of the plaintiff's right of freedom of speech and of freedom of expression as secured to the plaintiff by the First Amendment and the Fourteenth Amendment of the Constitution of the United States. The First Amendment right of freedom of speech and freedom of expression extends to the plaintiff even though the plaintiff is a corporation. It is entitled to exactly the same right under the First Amendment with regard to freedom of speech and freedom of expression as would be any individual.

Upon the other hand, the defendants have denied that their action in refusing to lease the Tivoli Theater and/or the Municipal Auditorium was in violation of the plaintiff's right to freedom of speech or the plaintiff's right to freedom of expression or to the plaintiff's rights under either the First or Fourteenth Amendments of the United States Constitution. The defendants contend that the theatrical production which the plaintiff proposes to present and for which it seeks a lease is obscene and as such it accordingly is not entitled to the protection either of the First Amendment or of the Fourteenth Amendment of the United States Constitution. The issue for your decision, accordingly, has its legal basis in the First Amendment of the United States Constitution and the application of that Amendment to the facts of this case.

More particularly, the issue for your decision has its legal basis in the freedom of speech provision of the First Amendment. The relevance of referring to the Fourteenth Amendment in this regard is that the due process clause of the Fourteenth Amendment has the effect of making the provisions of the First Amendment binding upon the states and the cities and the local governments of this Nation as well as upon the Federal Government. You see, as originally adopted, the First Amendment only purported to prohibit the United States Congress from making laws abridging freedom of speech, freedom of religion and freedom of assembly. But with the adoption of the Fourteenth Amendment, requiring that state and local governments extend due process of law to all persons, that Amendment had the effect of making the First Amendment binding upon the states, cities, and local governments within this Nation also.

Let me read for you the First Amendment of the United States Constitution. It reads as follows:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

Although the Amendment refers, as I have said, to the Congress, as I have further just explained to you, it is equally applicable to the government at all levels, including the State of Tennessee and the City of Chattanooga and including the defendants to this lawsuit, who, as members and officials of the Chattanooga Auditorium Board, are an arm of the City of Chattanooga and as such are subject to the prohibitions of the First Amendment.

The First Amendment as it relates to the issues in this lawsuit accordingly prohibits the defendants from taking any action which would have the effect of denying the plaintiff its right to freedom of speech as guaranteed in the First Amendment of the Constitution. You are instructed in this regard that a theatrical production as a mode of expression or as a mode of conveying ideas or entertainment is entitled to the protection of the freedom of speech pro-

vision of the First Amendment. However, freedom of speech is not an absolute or all encompassing right. By that, I mean not every form of expression may claim to be protected by the constitutional guarantee of freedom of speech. One form of expression that does not come within the protection of the First Amendment is obscenity. That is, the denial to a person of the right to express himself in a manner that falls within the legal definition of obscenity is not a violation of that person's right to freedom of speech. Accordingly, the defendants may lawfully refuse to lease either the Tivoli Theater and/or the Municipal Auditorium to the plaintiff if the theatrical production "Hair" which the plaintiff proposes to present is obscene as I shall proceed to define that word "obscene" for you.

The word "obscene" is, of course, a word in common use and is a part of our everyday language. As we use it in our everyday language and as it is defined in Webster's Dictionary, it means "foul; disgusting; offensive to chastity or to modesty; lewd." That, however, is not the definition that you must apply in testing the issue of obscenity in this case.

Now, I only point that out to you to point out that it is not the definition of legal obscenity. As I am using the word "obscene" in these instructions, it has a special, legal definition and you must apply that legal definition in deciding the issue that is for your decision in this case. The United States Supreme Court has defined (in the case of Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498, as amplified in Manual Enterprises, Inc. v. Day, 370 U.S. 478, 82 S.Ct. 1432, 8 L.Ed. 2d 639) the word "obscenity" as it relates to matters that do not fall within the protection of the freedom of speech provision of the First Amendment. This Court and this jury are bound by that definition and must follow that definition in making their determination in this case.

As defined by the United States Supreme Court, legal obscenity is any material to which the "average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest."

Let me read the definition over for you again. As defined by the United States Supreme Court, legal obscenity is any material which to "the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest."

Now, the Court goes further to define certain of those terms and expressions in that definition and I will give you those instructions likewise; but suffice it to say at this point that before the jury could find the theatrical production that is the subject of this lawsuit obscene, it must determine whether, to the average person applying contemporary community standards, the dominant theme of the material in that theatrical production taken as a whole appeals to prurient interest.

Let me now break that definition down for you into its component parts and explain for you the meaning of certain words and phrases as are used in that definition and as they have been further defined by the United States Supreme Court. You will notice that the first part of the definition refers to the average person applying contemporary community standards. The community standard here referred to is not a standard that varies from one locality to another within the Nation but rather means the contemporary national community standards.

You will notice that the second part of the definition of obscenity as established by the United States Supreme Court is that "the dominant theme of the material taken as a whole appeals to prurient interest." The phrase, "the dominant theme of the material taken as a whole," means that the theatrical production here challenged as obscene

must be judged as a whole. The phrase "appeals to the prurient interest," means having a tendency to excite lustful thoughts or material that appeals to a shameful or morbid interest in sex and is utterly without redeeming social value. The material must be patently offensive in that it goes substantially beyond contemporary limits of candor in description or representation of such matters.

Thus, by way of summing up, before the theatrical production here in issue can be found to be legally obscene, these elements must coalesce: It must be established, first, that the dominant theme of the material taken as a whole appeals to a prurient interest in sex; and, second, that the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and, third, that the material is utterly without redeeming social value.

Now, in making your determination with regard to obscenity or non-obscenity, you will not be concerned with whether the material in the play is pro-religion or anti-religion; you will not be concerned with whether the material is pro-pollution or anti-pollution; you will not be concerned with whether the material is pro-free love or anti-free love; you would not be concerned with whether it is pro-drug culture or anti-drug culture; you would not be concerned with whether it is pro-parental authority or anti-parental authority; you would not be concerned with whether it is pro-war, anti-war or whether it is pro-government or anti-government or whether it expresses popular ideas or unpopular ideas. The concept of obscenity cannot be based upon the ideas that may be expressed, whether those ideas express these concepts or not. We are not here to judge those matters but rather you want to follow the definition of obscenity as I have given it to you in these instructions. In other words, it is not a question of whether you agree or disagree with the ideas being expressed or conveyed in the theatrical production "Hair." The question is whether or not the material is obscene as I have defined that term or given you that definition.

So far in these instructions, in defining obscenity, I have been referring to speech in all of its forms, including conduct that is so closely related to speech as to be considered symbolic speech or expressive of speech. Just as speech may be obscene, likewise conduct, apart from speech or apart from conduct that is expressive of speech, may be obscene. However, there is a difference in obscenity as it refers to speech on the one hand, which I have just defined for you, and obscenity as it refers to conduct separate and apart from speech upon the other hand.

The freedom of speech provisions of the First Amendment refer to speech and not to human conduct that is not expressive of speech; that is, conduct apart from speech or conduct that is not so closely related to speech as to constitute symbolic speech as it is sometimes referred to. Since the freedom of speech provision of the First Amendment accords no protection against the regulation of human conduct by the government, whether federal, state or local, the freedom of speech provision of the First Amendment accords no protection against the regulation of obscene conduct by the various levels of government. Since the obscenity statutes and the ordinances relied upon by the defendants in this case apply to both obscene speech and to obscene conduct, then irrespective of how you may decide the issue of obscenity as it relates to the theatrical production "Hair" when considered as speech, and when considered as a whole, you should turn your attention to the conduct of the performers in the theatrical production "Hair" that is not speech or is not conduct that may be considered symbolic speech or expressive of speech and determine whether that conduct is obscene as I shall now define the word.

The definition of obscenity as it relates to conduct apart from speech is the same as the definition of obscenity as it relates to speech with two exceptions. The first exception is that since no First Amendment federal constitutional issue is involved, obscene conduct may be judged in its component parts rather than merely judging the whole conduct or merely judging the whole of the theatrical production in making your judgment regarding obscenity on the basis of conduct as a whole or of the material of the production as a whole; that is, conduct may be adjudged obscene or non-obscene either as a whole or in any of its component parts.

The second difference between the definition of obscenity as it applies to conduct rather than speech is that since no First Amendment federal constitutional issue is involved, the community standard by which the conduct is to be judged is the community standard of the State of Tennessee rather than the community standard of the Nation as a whole. Thus, obscenity as it relates to conduct apart from speech means, first, conduct that appeals to the prurient interest in sex; and, second, conduct that is patently offensive because it affronts contemporary standards. The standards here referred to being those of the state in which the conduct occurs; and, third, conduct that is utterly without redeeming social value.

In addition to the matters I have instructed you, you are further instructed with regard to the issue of obscenity that not every portrayal of male or female nudity is necessarily obscene. It depends, of course, upon the context and circumstances. The portrayal of sex in art, literature or scientific works is not of itself sufficient reason for denying material the constitutional protection of freedom of speech; and, likewise, foul words just standing alone without regard to context of the whole content do not constitute legal obscenity as I have defined that term for you.