SOUTHEASTERN PROMOTIONS, LTD., Plaintiff-Appellant,

v.

Steve CONRAD et al., Defendants-Appellees.

No. 72-1672.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 28, 1972.

Decided May 30, 1973.

Rehearing and Rehearing In Banc Denied Oct. 30, 1973.

Henry P. Monaghan, Boston, Mass., John Alley, Alley & Raulston, Chattanooga, Tenn., Gerald A. Berlin, Boston, Mass., on brief, for plaintiff-appellant.

Randall L. Nelson, Special Counsel, Chattanooga, Tenn., Eugene Collins, City Atty., Chattanooga, Tenn., on brief, for defendants-appellees.

Before WEICK and McCREE, Circuit Judges, and O'SULLIVAN, Senior Circuit Judge.

O'SULLIVAN, Senior Circuit Judge.

This is an appeal from dismissal of plaintiff-appellant's complaint seeking a

declaratory judgment and a mandatory injunction whereby to require the Municipal Auditorium Board of Chattanooga, Tennessee, to lease a municipal theatre to appellant, there to exhibit the stage play HAIR. The theatre in question was under the control of such Auditorium Board. The case was heard at Chattanooga by the Honorable Frank W. Wilson, Chief Judge of the United States District Court for the Eastern District of Tennessee, Southern Division. He denied the relief asked by plaintiff-appellant.

We affirm the judgment of the District Court on the opinion of the District Judge. Such opinion is reported as Southeastern Promotions, Inc. v. Conrad, 341 F.Supp. 465 (E.D.Tenn.1972).

While we adopt such opinion, we think it right to say this much more. After disposing of several grounds asserted by defendants to support their motion to dismiss, as without validity, the District Judge set out the controlling issues as follows:

### "Trial on the Merits

"Turning to the merits of this lawsuit, the pleadings raise essentially the issue of whether the defendant Board acted within its lawful discretion in declining to lease its theater and/or auditorium facility to the plaintiff for the reason that the plaintiff's theatrical production 'Hair' would violate Paragraph (1) of the standard lease form requiring the lessee to comply with all state and local laws in its use of the leased premises. More specifically, the issue presented by the pleadings is whether the theatrical production 'Hair' would violate any constitutionally valid provision of the common law of Tennessee relating to indecent exposure, gross indecency, or lewdness or would violate any constitutionally valid provision of City ordinances and State statutes which, among other matters, purport to make public nudity and obscene acts criminal offenses." 341 F.Supp. at 471.

With instructions, the propriety of which appellant does not challenge, there was submitted to an advisory jury the question of whether the production was obscene. Their verdict said that it was. The judge, then reviewing the same evidence and correctly employing the governing rules, made his own finding that the play was obscene.

At the outset, we think that understanding of this decision will be aided by setting out the style, action and content of HAIR as recited in the District Court's opinion. That such recital was accurate is not here challenged by plaintiff-appellant. Here it is:

### "Findings of Fact

"Turning first to the issue of obscenity, the script, libretto, stage instructions, musical renditions, and the testimony of the witnesses reflect the following relevant matters (It should be noted that the script, libretto, and stage instructions do not include but a small portion of the conduct hereinafter described as occurring in the play):

"The souvenir program as formerly distributed in the lobby (Exhibit No. 1) identified the performers by picture and biographical information, one female performer identifying herself as follows:

'Hobbies are picking my nose, fucking, smoking dope, astro projection. All that I am or ever hope to be, I owe to my mother.'

It was testified that distribution of this program had now been discontinued. Prior to the opening of the play, and to the accompaniment of music appropriate to the occasion, a 'tribe' of New York 'street people' start gathering for the commencement of the performance. In view of the audience the performers station themselves in various places, some mingling with the audience, with a female performer taking a seated position on center stage with her legs spread wide to expose to the audience her genital area, which is covered with the design of a cherry. Thus the stage is set

for all that follows. The performance then begins to the words and music of the song 'Aquarius,' the melody of which, if not the words, have become nationally, if not internationally, popular, according to the evidence. The theme of the song is the coming of a new age, the age of love, the age of 'Aquarius.' Following this one of the street people, Burger, introduces himself by various prefixes to his name, including 'Up Your Burger,' accompanied by an anal finger gesture and 'Pittsburger,' accompanied by an underarm gesture. He then removes his pants and dressed only in jockey shorts identifies his genitals by the line, 'What is this God-damned thing? 3,000 pounds of Navajo jewelry? Ha! Ha! Ha!' Throwing his pants into the audience he then proceeds to mingle with the audience and, selecting a female viewer, exclaims, 'I'll bet you're scared shitless.'

"Burger then sings a song, 'Looking for My Donna,' and the tribe chants a list of drugs beginning with 'hashish' and ending with 'Methadrine, Sex, You, WOW!' (Exhibit No. 4, p. 1–5) Another male character then sings the lyric.

'SODOMY, FELLATIO, CUNNILINGUS, PEDERASTY—FATHER, WHY DO THESE WORDS SOUND SO NASTY? MASTURBATION CAN BE FUN. JOIN THE HOLY ORGY, KAMA SUTRA, EVERYONE.' (Exhibit No. 4, p. 1–5)

"The play then continues with action, songs, chants, and dialogue making reference by isolated words, broken sentences, rhyme, and rapid changes to such diverse subjects as love, peace, freedom, war, racism, air pollution, parents, the draft, hair, the flag, drugs, and sex. The story line gradually centers upon the character Claude and his response and the response of the tribe to his having received a draft notice. When others suggest he burn his draft card, he can only bring himself to urinate upon it. The first act ends when all performers, male and female, appear nude upon the stage, the nude scene being had

without dialogue and without reference to dialogue. It is also without mention in the script. Actors simulating police then appear in the audience and announce that they are under arrest for watching this 'lewd, obscene show.'

"The second act continues with song and dialogue to develop the story of Claude's draft status, with reference interspersed to such diverse topics as interracial love, a drug 'trip,' impersonation of various figures from American history,[2] religion, war, and sex. The

[2] Lincoln is regaled with the following lyrics: 'I's free now thanks to you, Massa Lincoln, emancipator of the slave, yeah, yeah, yeah! Emanci—mother fucking—pater of the slave, yeah, yeah, yeah! Emanci—mother fucking—pater of the slave, yeah, yeah, yeah!' With Lincoln responding, 'Bang my ass . . . I ain't dying for no white man!'

play ends with Claude's death as a result of the draft and the street people singing the song, 'Let the Sunshine In,' a song the testimony reflects has likewise become popular over the Nation.

"Interspersed throughout the play, as reflected in the script, is such 'street language' as 'ass' (Exhibit No. 4, pp. 1–20, 21 and 2–16), 'fart' (Exhibit No. 4, p. 1–26), and repeated use of the words 'fuck'[3] and the four letter word for ex-

[3] A woman taking her departure says to the tribe, 'Fuck off, kids.' (Exhibit No. 4, p. 1–35). The following dialogue occurs as Claude nears his death scene:
'Burger: I hate the fucking world, don't you?
'Claude: I hate the fucking world, I hate the fucking winter, I hate these fucking streets.
'Burger: I wish the fuck it would snow at least.
'Claude: Yeah, I wish the fuck it would snow at least.
'Burger: Yeah, I wish the fuck it would.
'Claude: Oh, fuck!
'Burger: Oh, fucky, fuck, fuck!' (Exhibit No. 4, p. 2–22)

cretion (Exhibit No. 4, pp. 1–7, 9 and 41). In addition, similar language and posters containing such language were used on stage but not reflected in the script.

"Also, throughout the play, and not reflected in the script, are repeated acts of simulated sexual intercourse. These were testified to by every witness who had seen the play. They are often unrelated to any dialogue and accordingly could not be placed with accuracy in the script. The overwhelming evidence reflects that simulated acts of anal intercourse, frontal intercourse, heterosexual intercourse, homosexual intercourse, and group intercourse are committed throughout the play, often without reference to any dialogue, song, or story line in the play. Such acts are committed both standing up and lying down, accompanied by all the bodily movements included in such acts, all the while the actors and actresses are in close bodily contact. At one point the character Burger performs a full and complete simulation of masturbation while using a red microphone placed in his crotch to simulate his genitals. The evidence again reflects that this is unrelated to any dialogue then occurring in the play. The evidence further reflects that repeated acts of taking hold of other actors' genitals occur, again without reference to the dialogue. While three female actresses sing a song regarding interracial love, three male actors lie on the floor immediately below them repeatedly thrusting their genitals at the singers. *At another point in the script (Exhibit No. 4, p. 2–22) the actor Claude pretends to have lost his penis. The action accompanying this line is to search for it in the mouths of other actors and actresses.*"

341 F.Supp. at 472–474 (Emphasis supplied).

▮ The instructions which the District Judge gave to the jury are also set out in his opinion. While appellant, as a second position, asserts that the play HAIR is not in fact obscene, the principal thrust of its address to us is that the producer's First Amendment right to free speech forbids any interference with the exhibition of the play. They fault the District Judge for allegedly considering the obscene conduct in the play independently from its "speech." Their argument appears to be that obscenity must be tolerated if it is a part of the same vehicle whereby First Amendment rights are allegedly being exercised. They say:

"These forms of communication [motion pictures or plays] are to be treated for what they are, not artificially carved into speech and 'something else.' * * *

"We think it apparent then that the judge's attempt to draw an artificial distinction between speech and conduct is wholly without support in either reason or authority."

We agree with the District Judge that free speech cannot be used as a vehicle to carry obscenity—thus to allow, without limit, public exhibition of obscenities. We must be aware that the speech of the play is employed to give meaning to the physical conduct of the players. While it is not necessary to affirmance of the District Judge, we are persuaded that the play's language—its speech—is itself obscene. Whether the play is considered separately as to its speech and its conduct, or they are joined, it is obscene.

Appellant's brief does not provide a succinct expression of a message conveyed by HAIR. From our reading of the witnesses who found, and attempted explanation of its message, we assume, the message was to expose the "hypocrisy" of today's middle class, middle aged society, in its attitude toward sex. We do not think that any society can be charged with hypocrisy for finding less than beautiful,

"SODOMY, FELLATIO, CUNNILINGUS, PEDERASTY—FATHER, WHY DO THESE WORDS SOUND SO NASTY?

MASTURBATION CAN BE FUN. JOIN THE HOLY ORGY, KAMA SUTRA, EVERYONE."

The foregoing is a part of the lyrics of one of the play's songs. We are not persuaded that the First Amendment can be construed as providing that "anything

goes" so long as a message is claimed to be given.

Appellant emphasizes the success that has attended the showing of HAIR, saying:

"HAIR is a musical which deals with the life styles of many young people and their attitudes on the Vietnam war, racism, sex, drugs, pollution, etc. It has been produced in 140 American cities and in fourteen cities throughout the remainder of the world. *HAIR is the most popular box office attraction in the history of American theatre.*" (Emphasis supplied.)

One of appellant's witnesses, in speaking of HAIR's message, said that the play expresses "the hoped for *cleansing and rebirth* of this society," (Emphasis supplied). It was asserted by another, who compared HAIR with the musical "Oklahoma":

"It [HAIR] brought a new kind of music to the theatre and a new seriousness even beyond that of 'Oklahoma'".

Two college professors supported the claim that HAIR expressed a worthwhile message. A player identified himself as follows: "George Burger, Unzipped Burger, Pull 'em down Burger, Up Your Burger," and as recited by the District Judge, this was accompanied by an anal finger gesture. One of the professors said of this, "I think in some context it can have redeeming social value."

We ponder whether HAIR's box office success supports appellant or merely portrays that those charged with enforcing the law have now despaired of success in attempts to frustrate the obscenity and pornography which is being thrust upon today's total society.

Appellant says that the few district courts which have denied relief to the producers of HAIR were reversed on appeal, citing Southeastern Promotions, Ltd. v. City of West Palm Beach, 457 F. 2d 1016 (5th Cir. 1972); Southeastern Promotions, Ltd. v. Oklahoma City, Oklahoma, 459 F.2d 282 (10th Cir. 1972); and Southeastern Promotions, Ltd. v. City of Mobile, Alabama, 457 F.2d 340 (5th Cir. 1972). It will be sufficient to say that in none of these cases was obscenity *vel non* in issue.

We consider that the District Judge's opinion adequately discusses and disposes of all of the issues before him.

Judgment affirmed.

WEICK, Circuit Judge (concurring).

I concur in Judge O'Sullivan's opinion. I would add only a few comments.

Ordinarily, an owner of real property may rent it to whomever he pleases. He would have the right to decide whether he ought to rent his property to persons who desire to exhibit conduct which is not in good taste. Certainly no court should order him under the First Amendment to exhibit offensive conduct portraying immoral sexual acts of the worst sort.

The auditorium involved in this case belonged to the City, which is a political subdivision of the State. It was constructed with taxpayers' money. It goes without saying that the city fathers could not be compelled to rent the auditorium to a person who desired to operate therein a house of ill fame, in violation of state law. Yet the conduct exhibited by the film in the present case is even worse as it portrays obscene sexual acts which could be committed only by depraved persons.

We do not consider here the right of a person to exhibit such a film on his own property or on property which he has rented. Our case involves only the question whether a federal court has any right to order the state to permit the exhibition for profit of filthy, obscene, sexual material on state property. Federal Courts ought not take over the operation of state facilities.

In California v. LaRue, 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972), the Court upheld the right of the state to prohibit the exhibition of obscene material in a private saloon. Here, we are

dealing, not with private property, but with public property and with police power of the state.

As pointed out in *LaRue*, the First Amendment protects "expression", not "action". Our case involves only depraved sexual action.

We would doubt that a Federal Court would ever attempt to compel the Federal Government to rent its property for any such immoral purpose. It is also inconceivable that a Federal Court would order such an exhibition to be held in the Eisenhower Theatre located in the John F. Kennedy Center for the Performing Arts at the Capitol. State facilities should be treated with the same respect as federal facilities.

No one has a constitutional right to exhibit obscene sexual acts in public buildings.

McCREE, Circuit Judge (dissenting).

I respectfully dissent. I believe Judge Edenfield correctly stated the test to be applied in determining whether a play is obscene in his opinion in Southeastern Promotions, Ltd. v. City of Atlanta, 334 F.Supp. 634, 639 (N.D.Ga.1971), in which an official of the Atlanta Civic Center refused to lease the auditorium for the exhibition of "Hair":

> The court cannot accept the proposition that stage productions may be dissected into 'speech' and 'non-speech' components as those terms have been used by the Supreme Court. The nonverbal elements in a theatrical production are the very ones which distinguish this form of art from literature. It may be true that First Amendment protections vary in different media, but a musical play must be deemed a unitary form of constitutionally protected expression. The court concludes that the entire musical play 'Hair' is speech and entitled to First Amendment protection.

The District Judge in our case sought unsuccessfully to distinguish Judge Edenfield's opinion by stating:

The fallacy of that position is readily apparent, however, if any crime other than the crime of obscenity were committed in the course of a live state production. That Court would doubtless have no difficulty in disecting [sic] speech and nonspeech components if the crime committed on the stage were the crime of rape or homicide, even though called for in the script. It is a false and dangerous doctrine that the First Amendment forbids all regulation of conduct so long as that conduct masquerades under the guise of the theatrical.

Southeastern Promotions, Ltd. v. Conrad, 341 F.Supp. 465, 476 (E.D.Tenn. 1972). It begs the question to call an act viewed in isolation as criminal when the constitutional test of criminality *vel non* requires it to be examined in context. Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1956); Memoirs v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966).

As Mr. Justice Marshall stated in his dissent in California v. LaRue, 409 U.S. 109, 130, 93 S.Ct. 390, 402, 34 L.Ed.2d 342 (1972):

> If, as these many cases hold, movies, plays and dance enjoy constitutional protection, it follows, ineluctably I think, that their component parts are protected as well. It is senseless to say that a play is 'speech' within the meaning of the First Amendment, but that the individual gestures of the actors are 'conduct' which the State may prohibit.

The majority opinion in *LaRue* implicitly rejected the technique of excerpting and censoring specific conduct from a protected vehicle. In observing that "[t]he state regulations here challenged come to us, not in the context of censoring a dramatic performance in a theater, but rather in the context of licensing bars and nightclubs to sell liquor by the drink," 409 U.S. at 114, 93 S.Ct. at 395, the Court acknowledged that some of the performances banned by the regulations

from presentation in establishments licensed to sell liquor by the drink would have been protected if offered in a theater:

> We do not disagree with the District Court's determination that these regulations on their face would proscribe some forms of visual presentation that would not be found obscene under *Roth* and subsequent decisions of this Court. See, *e. g.*, Sunshine Book Co. v. Summerfield, 355 U.S. 372 [78 S.Ct. 365, 2 L.Ed.2d 352] (1958) rev'g per curiam, 101 U.S.App.D.C. 358, 249 F.2d 114 (1957). But we do not believe that the state regulatory authority in this case was limited to either dealing with the problem it confronted within the limits of our decisions as to obscenity, or in accordance with the limits prescribed for dealing with some forms of communicative conduct in *O'Brien* (United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672) *supra*.

. . . . . .

> The substance of the regulations struck down prohibits licensed bars or nightclubs from displaying, either in the form of movies or live entertainment, "performances" that partake more of gross sexuality than of communication. While we agree that at least some of the performances to which these regulations address themselves are within the limits of the constitutional protection of freedom of expression, the critical fact is that California has not forbidden these performances across the board. It has merely proscribed such performances in establishments that it licenses to sell liquor by the drink.

> Viewed in this light, we conceive the State's authority in this area to be somewhat broader than did the District Court. This is not to say that all such conduct and performance is without the protection of the First and Fourteenth Amendments. But we would poorly serve both the interests for which the State may validly seek vindication and the interests protected by the First and Fourteenth Amendments were we to insist that the sort of Bacchanalian revelries that the Department sought to prevent by these liquor regulations were the constitutional equivalent of a performance by a scantily clad ballet troupe in a theater. 409 U.S. at 116, 118, 93 S.Ct. at 396, 397.

Nevertheless, and perhaps because of reluctance to rely solely on the theory of the District Court, my brothers in this appeal make their own additional finding (consistent with that of the advisory jury) that the play "Hair," viewed as a whole, is obscene. With this determination I also disagree. However, instead of contributing further to the already too extensive and inelegant legal literature recounting tawdry details of challenged works, I observe merely that I know an obscene play when I see one and upon autoptic view "Hair" is not that. *See* Jacobellis v. Ohio, 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring).

I would reverse and remand with instructions to grant the relief prayed for.

## ON PETITION FOR REHEARING

Before WEICK and McCREE, Circuit Judges, and O'SULLIVAN, Senior Circuit Judge.

## ORDER

This cause is before the Court upon the motion of Plaintiff-Appellant for rehearing, with suggestion for rehearing in banc; and Appellees having filed a brief responsive to said motion, as ordered by this Court; upon request for a vote to be taken, a majority of the active judges of this Court voted against such rehearing in banc. Therefore,

It is ordered that rehearing in banc be, and the same is, hereby denied. Circuit Judge EDWARDS and Circuit Judge McCREE dissent.

Such motion for rehearing in banc having been denied, the matter of rehear-

ing has been considered and will be disposed of by the panel that originally heard the appeal. Therefore,

It is ordered that the petition of Plaintiff-Appellant for rehearing be, and the same is, hereby denied. Circuit Judge McCREE dissents.

Entered by order of the Court.

WEICK, Circuit Judge, and O'SULLIVAN, Senior Circuit Judge.

Judge Edwards' dissent from denial of an in banc rehearing, with concurrence of Judge McCree, suggests the propriety of this supplement to the original majority opinion.

The dissent asserts:

"Unless the Supreme Court grants certiorari, this case will represent a final adjudication that the play 'Hair' is obscene and subject to being banned under state obscenity laws in Michigan, Ohio, Kentucky and Tennessee * * *."

■■■ We respectfully disagree. The procedural setting of this litigation makes clear the invalidity of such observation, as well as the inapplicability of the authorities cited in the dissent.

This case involved an action in equity. Plaintiff sought the aid of equity for a declaratory judgment and a mandatory injunction to require the Board of Directors of the Chattanooga Memorial Auditorium to allow exhibition therein of the play HAIR. The complaint relied on 28 U.S.C. §§ 2201 and 2202, which empower courts of equity to enter declaratory judgments. The complaint also averred deprivation of civil rights, but nowhere does the plaintiff assert a civil right to put on its show wherever it chooses. The following general principles apply to the granting or withholding of the relief sought by appellant.

"Injunction is distinctly an *equitable remedy*, the power to grant which stands forth as a distinct head of equitable jurisprudence and the principal and most important of its issued processes." 42 Am.Jur.2d. Injunc-

tions § 2, at 727–728 (1969). (Emphasis supplied.)

Application for such equitable relief invokes the Court's discretion.

"Injunctive relief, whether prohibitory or mandatory, is granted or withheld in the exercise of sound judicial discretion * * * *." 42 Am.Jur.2d. Injunctions § 20, at 751 (1969).

Applications for a declaratory judgment are likewise addressed to equity's discretion. In Eccles v. Peoples Bank, 333 U.S. 426, 431, 68 S.Ct. 641, 644, 92 L.Ed. 784 (1948), the Supreme Court said:

"A declaratory judgment, like other forms of *equitable relief*, should be granted only as a matter of judicial discretion, exercised in the public interest." (Emphasis supplied.)

In Abbott Laboratories v. Gardner, 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967) the Court said:

"The injunctive and declaratory judgment remedies are discretionary, * * * *."

The history and purpose of the creation of Soldiers & Sailors Memorial Auditorium by the people of Chattanooga are set out in a booklet which was received in evidence at trial. Its preface recites:

"The dedication of the Soldiers and Sailors Memorial Auditorium marks, as permanently as the work of finite hands may mark, the grateful appreciation in which Chattanooga holds her sons who offered their lives to the Nation's service in the great World War [World War I].

"We erect for posterity, in commemoration of their patriotism, a hall in which mementoes, of their achievement may rest; an auditorium in which great bodies of our people may assemble for civic service; *for the cultivation of the arts; for the promotion of a higher and a broader citizenship.* It is fitting and well that our tribute should take this form." (Emphasis supplied.)

The booklet, "Souvenir of Dedication" under a heading, "Its Operation and Management" sets out:

"It is the hope and ambition of the Board of Directors of the Soldiers and Sailors Memorial Auditorium to conduct the operation of the building in such manner as to render the greatest possible service to all the people of Chattanooga, Hamilton County and this section of the South.

"It will be their endeavor to make it the community center of Chattanooga, where civic, educational, religious, patriotic and charitable organizations and associations may have a common meeting place to discuss and further the upbuilding and general welfare of the city and surrounding territory.

"It will not be operated for profit, and no effort to obtain financial returns above the actual operating expenses will be permitted. *Instead its purpose will be devoted for cultural advancement, and for clean, healthful, entertainment which will make for the upbuilding of a better citizenship."* (Emphasis supplied.)

The booklet's picture of the auditorium shows it to be a beautiful and commodious public building. The plaintiff-appellant, a New York Corporation—booking agent for the play HAIR—first sought to use a theatre, the Tivoli, a one-time commercial theatre which had been acquired by the City. Desiring, however, the larger capacity of the auditorium, the plaintiff sought equity's aid to force opportunity to use it. A witness for plaintiff testified that a one-night production of their play in the auditorium would have made a profit in excess of $10,000. Having in mind the purposes for which the people of Chattanooga created their Soldiers & Sailors Memorial Auditorium, a court of equity cannot be faulted for withholding its writ whereby to command the Directors of the Auditorium to allow exhibition therein of a production containing the language and conduct set out in the District Judge's opinion.

We are not persuaded that the great principles which control employment of equitable remedies must stand aside when the courts are dealing with the ever-widening contests requiring resolution of what is and what is not obscenity. We had thought that Judge Weick's concurring opinion succinctly exposed the validity of this conclusion. We are constrained, however, by the current dissent to make these more extensive observations.

It is true that the District Judge did make a finding that the play HAIR is obscene and a violation of the ordinances of the City of Chattanooga and the statutes of Tennessee. In the original opinion of Judge O'Sullivan such a finding was approved. We believe, however, that it was not improper for the District Judge to consider whether the play was obscene before determining whether or not to order the Directors of the Auditorium to allow its exhibition in Chattanooga.

While we do not claim that its facts make our opinion in Associated Students of Western Kentucky University v. Downing, 475 F.2d 1132 (6th Cir. 1973) a totally controlling precedent, we cite it as being consonant with what we say here. There, the governing officials of the named University cancelled a booking contract which it had previously made for the showing of a moving picture film described in the opinion. As here, plaintiffs sought a declaratory judgment and injunctive relief whereby to forbid the governing officials of Western Kentucky University from prohibiting exhibition of the film sponsored by plaintiffs—Associated Students of Western Kentucky University. In affirming refusal of the governing Board of the University to allow exhibition of the film, we said:

"In the present case the University did nothing more than to make a determination that, with respect to a particular experimental film, it would be 'inappropriate for the University to continue as a contracting party.'" 475 F.2d at 1134.

We have considered the recent decisions of the Supreme Court in Miller v. California, —— U.S. ——, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), and Paris Adult Theatre v. Slaton, District Attorney, —— U.S. ——, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973), and consider that our decision and that of the District Court in the case before us are not inconsistent therewith.

EDWARDS, Circuit Judge, dissenting, with whom McCREE, Circuit Judge, joins:

One of the "basic guidelines" recently reaffirmed by the Supreme Court in relation to the determination of a charge of obscenity is "whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." Miller v. California, 413 U.S. 15, 2615, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419 (1973). *See also* Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).

In this case the Municipal Auditorium Board of the City of Chattanooga has refused to rent the auditorium for the presentation of the play "Hair." A United States District Court has refused to grant relief from the board's decision on the ground that "Hair" is obscene. A panel of this court has affirmed the District Court, also holding that "Hair" is obscene. And the majority of our court has now rejected a motion to rehear the case in banc. All of this has been accomplished without any one of those participating in rejecting the play ever having seen it.[1] And at no level has any board member or judge entered a finding that the play "lacks serious literary, artistic, political, or scientific value."

While I would agree that at least some of the acts described so vividly in the opinions of the District Court (Southeastern Promotions, Ltd. v. Conrad et al., 341 F.Supp. 465 (E.D.Tenn.1972)) and of this court (Southeastern Promotions, Ltd. v. Conrad et al., 486 F.2d 894 (6th Cir. 1973)) could, if viewed separately, appropriately be labelled obscene under the present standards of the United States Supreme Court (*see* Miller v. California, *supra,* 413 U.S. at 24, 93 S.Ct. at 2615.) I do not agree that the play may be judged obscene, unless it is "taken as a whole" for purposes of that judgment. Thus far we have signally failed to do this. Taking words and sentences out of context, taking gestures employed in a play without reference to the rest of the play as has been done herein does not comply with the standard[2] set out in *Miller, supra,* and *Roth, supra.*

Over and above the first amendment violation described above the procedures employed to ban this play amounted to unconstitutional prior restraint on speech. *See* Paris Adult Theatre v. Slaton, —— U.S. ——, 93 S.Ct. 2628, 37 L.Ed. 2d 446 (1973); Blount v. Rizzi, 400 U.S. 410, 417, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971); Teitel Film Corp. v. Cusack, 390 U.S. 139, 141–142, 88 S.Ct. 754, 19 L.Ed.2d 966 (1968); Freedman v. Mary-

---

1. Judge McCree who did see the play dissented from the majority opinion characterizing it as obscene.

2. "A state offense must also be limited to works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value.

The basic guidelines for the trier of fact must be: (a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest, Kois v. Wisconsin, *supra,* 408 U.S. [229], at 230 [92 S. Ct. 2245, at 2246, 33 L.Ed.2d 312] (1972), quoting Roth v. United States, *supra,* 354 U. S., at 489 [77 S.Ct., at 1311] (1957), (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law, and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." 413 U.S. at 24, 93 S.Ct. at 2615.

land, 380 U.S. 51, 58–59, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).

Additionally the standards employed by the Municipal Auditorium Board in rejecting the application for rental at the theatre are clearly unconstitutionally vague.[3]

Unless the Supreme Court grants certiorari, this case will represent a final adjudication that the play "Hair" is obscene and subject to being banned under state obscenity laws in Michigan, Ohio, Kentucky and Tennessee—and this, we repeat, without any board member or judge so holding ever having seen the play.

My colleagues Judges Weick and O'Sullivan appear to dispute the accuracy of the paragraph above. I will let the record speak for itself.

Judge O'Sullivan's opinion, in which Judge Weick concurred, said:

> We affirm the judgment of the District Court on the opinion of the District Judge.

The opinion of the District Court held:

> This Court is accordingly of the opinion that the theatrical production "Hair" contains conduct, apart from speech or symbolic speech, which would render it in violation of both the public nudity ordinances of the City of Chattanooga and the obscenity ordinances and statutes of the City and of the State of Tennessee.

Reviewing the evidence independently, Judge O'Sullivan's opinion held:

> While it is not necessary to affirmance of the District Judge, we are persuaded that the play's language—its speech— is itself obscene. Whether the play is considered separately as to its speech and its conduct, or they are joined, it is obscene.

---

3. The Chattanooga Commissioner in charge of the municipal theatre testified before the District Court that the theatre was refused for presentation of "Hair" because the city permitted only productions which are "clean and healthful and culturally uplifting."