Timothy SWOPE, Michael Hartman, Diane Eskin, Michelle Gentile, and The Student Senate of Grand Valley State College, Plaintiffs,

v.

Arend LUBBERS, individually and in his official capacity of President of Grand Valley State College, Linda Johnson, individually and in her official capacity as Dean of the Students of Grand Valley State College, a public institution of higher education and the Board of Control of Grand Valley State College, a public corporate body, Defendants.

No. G83–311 CA6.

United States District Court,
W.D. Michigan, S.D.

April 7, 1983.

Kent W. Mudie, Ann Nowak, Gary Gershon, Grand Rapids, Mich., for plaintiffs.

Varnum, Riddering, Wierengo & Christenson by Dennis C. Kolenda and Teresa S. Decker, Grand Rapids, Mich., for defendants.

OPINION RE MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF

HILLMAN, District Judge.

Presently before the court are plaintiffs' requests for declaratory and injunctive re-

lief pursuant to Fed.R.Civ.P. 65. Plaintiffs allege that the rights secured them by the First Amendment, and their Fourteenth Amendment rights to due process of law have been violated, and accordingly bring suit under 42 U.S.C. § 1983. Jurisdiction is alleged under 28 U.S.C. §§ 1331 and 1343(3) and (4).

Plaintiffs are students at Grand Valley State College ["Grand Valley"], a publicly-funded state college,[1] and members of the Student Senate of the College. The defendants are, besides the College, members of Grand Valley's "Board of Control," Arend Lubbers, the President of the College, and Linda Johnson, Dean of Students.

The dispute arises out of the proposed showing of an "X"-rated film on the Grand Valley campus located near Grand Rapids. Each semester, at registration, Grand Valley students pay a "general service fee" of $15.00. This money is commingled with other college funds. Each year, the Grand Valley Student Senate is allocated $60,000 to be spent for extra-curricular student activities, such as the showing of motion pictures. A "Programming Committee" is formed by Student Senate members, and in the fall of 1982 it conducted a survey among Grand Valley students to assess interest in activities the Programming Committee could bring to campus. In the survey, ten categories of movies were listed (western, science fiction, etc.). The top three in order were "comedy," which received 179 votes; "adventure," 128 votes and "X-rated," 108 votes.

Typically, in the fall, a proposed schedule of films is presented by the Student Senate to the administration. Some time before a particular film is scheduled to be shown, a student on behalf of the Student Senate would write to Ms. Johnson or one of her assistants and request that funds be issued for the activity in question. Ms. Johnson or a staff member would then direct the college's Purchasing Department to issue a check to the vendor of the particular activity. The purchase order typically indicated that the money was spent on request of the Student Senate. If a film had been ordered, it was delivered to Ms. Johnson's office. Prior to February of 1983, no official guidelines had been adopted to guide defendant Johnson on what films she could or could not order.

In the fall of 1982, the Student Senate responded to the student interest reflected in the survey. Twenty-five films were selected. The schedule included only one X-rated film entitled "Inserts."[2] "Inserts" is a United Artists production starring Richard Dreyfus. Set in the 1930s, the film is about the crisis in the life of a man who had been a famous director of silent motion pictures. With the onset of "talkies" in the 1930s, the demand for silent films quickly evaporated. The film portrays how the director turned to the making of "pornographic" movies. The film was rated "X" on the scale of "suggested guidelines" promulgated by the Motion Picture Association of America.[3] Plaintiffs were subsequently told by defendant Johnson, and one of her administrative assistants, that funds would not be transferred to allow the ordering of "Inserts."[4]

The College does not have a system in effect that ensures prompt judicial determination of the constitutional status of films requested for Student Senate activities.[5]

During the ensuing months, the issue of whether or not Grand Valley would allocate $250.00 for the rental of "Inserts" was much debated between plaintiffs and defendants. Plaintiffs repeatedly requested that defendants put their views about "In-

1. Michigan Constitution 1963, Article 8, § 4.

2. Among the other films requested at that time were "Excalibur" (rated "PG"), "Dragonslayer" (also rated "PG"), "Some Kind of Hero" ("R" rating), "The Corpse Grinders" ("R"), "Star Wars" ("PG"), and the "Three Stooges Film Festival" ("G").

3. See Appendix # 1.

4. See Appendix # 2, Stipulated Facts, ¶ 16. Notice has been taken that reservation was made at the April 4, 1983, hearing as to paragraph 30 of the "Stipulated Facts." The parties have not been deemed to have stipulated to the contents of that paragraph.

5. See Appendix # 2, Stipulated Facts, ¶ 32.

serts" in writing, and sought the transfer of funds for "Inserts" again on or about February 14, 1983.[6] The transfer request was again denied. In late February, the Grand Valley Board of Control passed a resolution tacitly addressing the showing of "Inserts." The Board resolved that, while the College would not "ban" the showing of "X"-rated films on campus, "no institutional funds of this College shall be used by student organizations for the acquisition of X-rated films.... The Administration is directed to review and authorize the expenditure of institutional funds in accordance with this policy."[7]

Plaintiffs state that April 22 is the last possible date on which "Inserts" may be shown this school year. In order to obtain the film in time for the April 22 screening, the rental order must be placed by April 8th. To meet this deadline, plaintiffs filed suit on March 28th, requesting that defendants be enjoined from "refusing to allow" the transfer of funds sufficient to order "Inserts," and from otherwise interfering with the ordering or showing of the film.

Oral argument was heard by the court on April 4, 1983. The matter has been extensively and ably briefed by counsel.

### DISCUSSION

To be entitled to preliminary injunctive relief, plaintiffs must meet the well-established standards of *Mason County Medical Ass'n v. Knebel,* 563 F.2d 256 (6th Cir.1977), and *Roth v. Bank of Commonwealth,* 583 F.2d 527 (6th Cir.1978), *cert. dismissed,* 442 U.S. 925, 99 S.Ct. 2852, 61 L.Ed.2d 292 (1979), to-wit:

"1) Whether the plaintiffs have shown a strong or substantial likelihood or probability of success on the merits;

2) Whether the plaintiffs have shown irreparable injury;

3) Whether the issuance of a preliminary injunction would cause substantial harm to others;

4) Whether the public interest would be served by issuing a preliminary injunction."

The element of "probability of success" is a key issue in this case. Determining whether plaintiffs will probably succeed with the merits of their claim in turn is controlled to a large extent by the characterization of this dispute. Defendants argue that this is only a "funding" case, and that, as such, it involves no First Amendment rights. The sole issue, in defendants' view, is whether the Student Senate has the authority to require Grand Valley administrators to disburse funds when the administration has elected not to.

Plaintiffs characterize the dispute very differently. At issue here, they claim, is whether the First and Fourteenth Amendment rights of Grand Valley students should continue to be violated by College administrators. They argue that the practice of selectively disbursing funds set aside for extracurricular student entertainment constitutes a prior restraint that does not pass constitutional muster.

In support of the argument that this is a "funding" case, defendants would analogize the instant dispute to the so-called abortion cases: *Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977); *Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980); and *Poelker v. Doe,* 432 U.S. 519, 97 S.Ct. 2391, 53 L.Ed.2d 528 (1977). In each case, plaintiffs unsuccessfully contested whether a state entity could, in effect, refuse to fund plaintiffs' decisions to abort a pregnancy. Defendants stress that the right to have an abortion is constitutionally guaranteed after *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Here, they argue, the College has made a decision similar to that made by the government authorities in *Roe, Harris,* and *Poelker: e.g.,* a decision against funding an activity determined by the authorities to be against the best interests of the institution and those affiliated with it.

If in fact the instant case is a "funding" case like *Roe* and *Poelker,* the conduct of the defendants would meet constitutional requirements if it is "rationally" based. In

---

**6.** *Id.,* ¶¶ 20, 21.

**7.** *See* Appendix # 3, p. 1344.

*Harris* and *Maher,* the Supreme Court held that the governmental decision against funding abortions would be invalidated only if it rested on grounds "wholly irrelevant" to the achievement of a "legitimate" governmental objective. 448 U.S. at 322, 100 S.Ct. at 2691.

Defendants advance several reasons to establish a rational basis for their decision not to fund the showing of "Inserts." Initially, they argue that if they do not fund the rental of "X"-rated films such as "Inserts," they will better fulfill their responsibilities of maintaining the "quality" of campus activities. This is because defendants have concluded that movies with such a rating, as a group, generally do not meet their standards of the "quality" of activity they want promoted on the Grand Valley campus. Additionally, they note that using the Motion Picture Rating of a film as the criterion for funding is "rational" because it serves the administration's legitimate interest of saving time and effort over funding decisions, and it also benefits the students because the funding decision is not based on the subjective determination of a campus official.

Whether the defendants' decision to withhold funds from "X"-rated films is "rationally" based is not an issue here. This is because I find that the cases relied upon by defendants are inapposite. True, funds are at issue in this dispute, but that does not make this a "funding" case. To regard this dispute as a "funding" case would entail ignoring a large body of precedential case law erected to safeguard the First Amendment rights of persons such as these plaintiffs.

■ A fundamental tenet of constitutional analysis is "ranking" of constitutional rights. Over 20 years ago one scholar explained this ranking of rights as follows: "Freedom of expression is so vital in its relationship to the objectives of the Constitution that inevitably it must stand in a preferred position. In looking toward the fulfillment of that objective, there are a variety of [doctrinal] devices, to be employed separately or in combination, which enable the courts to express the constitutionally mandated preference for freedom of speech and thought." [8]

Defendants would ignore the settled view that constitutional rights are ranked in a hierarchy, and that differently-ranked rights are protected by rules derived from wholly separate doctrines. The "funding" cases concern the "lower-valued" rights originally said to derive from the "penumbra" of rights expressly guaranteed by the Constitution. *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). In the view of the Supreme Court, because the rights implicated in abortion funding cases have a relatively low constitutional status, they may be regulated by rules that meet the "lower" standard of being only "rationally" based. *See, e.g., Harris v. McRae, supra* 448 U.S. at 322, 100 S.Ct. at 2691.

First Amendment rights, however, have long been regarded as among the most precious. As one court stated, "[i]t needs no citation to suggest that first amendment liberties have been considered among the most important guaranteed to citizens in the Bill of Rights." *American Civil Liberties Union of Virginia, Inc. v. Radford College,* 315 F.Supp. 893, 896 (W.D.Va.1970); *see also Zamora v. C.B.S.,* 480 F.Supp. 199, 203 (S.D.Fla.1979).

■ As a correlative of that "preferred" status, governmental conduct regulating the exercise of First Amendment rights is constitutionally sound only if it passes "strict scrutiny." As the Supreme Court recently stated, "First Amendment rights are entitled to special constitutional solicitude. Our cases have required *the most exacting scrutiny* in cases in which a State undertakes to regulate speech." *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 277, 70 L.Ed.2d 440 (1981) (emphasis added).

■ It is my conclusion that this case does in fact involve First Amendment rights. Films convey ideas, and the right to receive the thoughts of others is a right protected by the First Amendment. Here,

**8.** Robert B. McKay, "The Preference for Freedom," 34 *N.Y.U.L.Rev.* 1184, 1191 (1959).

by the withholding of funds defendants have effectively ensured that a movie of which they disapprove will not be seen by the students of Grand Valley. The device of stopping funds has kept the film off campus since the fall of 1982 to this day. The label may be "funding," but the demonstrated effect is censorship. This conclusion is buttressed by comparing this case to factually similar cases.

In *Joyner v. Whiting,* 477 F.2d 456 (4th Cir.1973), for example, the United States Court of Appeals for the Fourth Circuit prohibited the President of North Carolina Central University from withdrawing all funds from the student-run newspaper. At the time of the lawsuit, NCCU was principally a black institution. The university president cut the funding for a student paper after the paper ran articles "questioning" the increasing number of white students on campus. The newspaper editor and the president of the university student association brought suit for alleged violation of their First and Fourteenth Amendment rights. As in the case at bar, the university did not ban the student publication, and made no objection to its being distributed on the campus. It simply objected to being asked to fund what it believed to be offensive and repugnant material.

The Fourth Circuit Court of Appeals rejected the "funding only" argument advanced by the university, saying:

> "Fortunately, we travel through well charted waters to determine whether the permanent denial of financial support to the newspaper because of its editorial policy abridged the freedom of the press. The First Amendment is fully applicable to the states ... and precedent establishes 'that state colleges and universities are not enclaves immune from [its] sweep.' A college acting 'as the instrumentality of the State, may not restrict speech ... simply because it finds the views expressed by any group to be abhorrent.' ... It may well be that a college need not establish a campus newspaper, or, if a paper has been established, the college may permanently discontinue publication for reasons wholly unrelated to the First

Amendment. But if a college has a student newspaper, its publication cannot be suppressed because college officials dislike its editorial comment.... This rule is but a simple extension of the precept that freedom of expression may not be infringed by denying a privilege....

> The principles reaffirmed in *Healy* have been extensively applied to strike down every form of censorship of student publications at state-supported institutions. Censorship of constitutionally protected expression cannot be imposed by suspending the editors, suppressing circulation, requiring imprimatur of controversial articles, excising repugnant material, withdrawing financial support, or asserting any other form of censorial oversight based on the institution's power of the purse."

[Footnotes and citations omitted.]

For other decisions similarly addressing the First Amendment implications of factually-similar disputes, *see, e.g., Healy v. James,* 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); *Brooks v. Auburn University,* 412 F.2d 1171 (5th Cir.1979); *Barnstone v. University of Houston,* 514 F.Supp. 670 (W.D.Tex.1980); *Reineke v. Cobb County School District,* 484 F.Supp. 1252 (N.D. Ga.1980); *Trujillo v. Love,* 322 F.Supp. 1266 (D.Colo.1971); *Korn v. Elkins,* 317 F.Supp. 138 (D.Md.1970); *Antonelli v. Hammond,* 308 F.Supp. 1329 (D.Mass.1970).

First Amendment principles apply even though the instant defendants have not totally banned the showing of "Inserts" on the Grand Valley campus. *Joyner* did not treat an absolute ban of the expression of segregationist views from the NCCU campus, but only the termination of funds for the student-run paper that had expressed such views. Similarly, in *Widmar v. Vincent, supra,* the defendant university sought to keep a religiously-oriented student group from using campus facilities for the group's meetings. The group was not barred from expressing its views elsewhere on the campus, and no sanctions were aimed at the members. The defendants in *Widmar* decided not to "subsidize" the religious group

by allowing it the free use of facilities granted other student groups. Even though the restraint placed on the *Widmar* plaintiffs was not a total ban, the Supreme Court held that the restriction violated the First Amendment rights of the religious group members. Similarly, the cut of funding for the student newspaper at issue in *Joyner* was not a total ban. The paper in fact continued to appear for a time after the university stopped funding it. The "partial" ban effected in *Joyner* was nonetheless deemed to violate the First Amendment. As the bar of funds in the instant case constitutes a similar "partial" ban, it too must be tested under the First Amendment.

Defendants have cited `Associated Students of Western Kentucky v. Downing*, 475 F.2d 1132 (6th Cir.1973) [*"Downing"*], to demonstrate that the First Amendment is not a factor in the instant case, and that, as a result, plaintiffs will probably not prevail on the merits of their case. In *Downing*, in contrast to the case presently before the court, the university and a student association had jointly planned and operated a series of educational programs for the benefit and enjoyment of the students. As a part of that program, a showing of the "experimental" films of John Lennon and Yoko Ono was scheduled. After a preliminary showing of the films, the university cancelled the contract. The Sixth Circuit held, without explanation, that the university's conduct did not violate constitutional rights of the student-plaintiffs. *Downing* was determined to be distinguishable from cases where university officials had violated the First Amendment rights of students by censoring student-sponsored programs or by otherwise interfering with the exercise of First Amendment rights. These factual differences appreciably distinguish *Downing* from the case at bar.

There is an additional reason for concluding that *Downing* does not mandate a finding in favor of the instant defendants. It would appear that the reasoning of *Downing* has been inferentially overruled. In *Southeastern Promotions, Ltd. v. Conrad,*

486 F.2d 894 (6th Cir.1973) [*"Southeastern"*], *Downing* was referred to as "consonant" with the disposition of the *Southeastern* case. 486 F.2d at 902. *Southeastern* was subsequently reversed by the Supreme Court. 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975).

The significance of that reference is that it makes express what would otherwise be implicit in an analysis of these three cases. In *Southeastern,* the Sixth Circuit validated content-based restrictions on the exercise of First Amendment rights. Those restrictions operated without any reference to the guidelines established for such restrictions in *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963), and in *Freedman v. Maryland,* 380 U.S. 51, 58, 85 S.Ct. 734, 738, 13 L.Ed.2d 649 (1965). The Supreme Court reversed the Sixth Circuit for having validated a system of prior restraint that lacked the *Bantam Books* procedures. The Supreme Court found that the conduct of the *Southeastern* defendants amounted to censorship, and that it constituted a prior restraint operating in violation of the First Amendment. 420 U.S. at 552–56, 560–62, 95 S.Ct. at 1243–45, 1247–48.

It is evident to me that the conduct held illegal by the Supreme Court in *Southeastern* is virtually identical to the conduct of the *Downing* defendants. In *Downing,* the university barred First Amendment activity on the basis of its content, and without a trace of even one of the procedures required to validate a content-based prior restraint under *Bantam Books* or *Freedman.* As the shadow cast over *Downing* by the Supreme Court's treatment of *Southeastern* strikes me as self-evident, and for the factual difference previously described, I conclude that *Downing* does not require a finding in favor of the defendants in the case at bar.

Defendants have conceded that their procedure does not satisfy the prior restraint requirements of *Bantam Books* or *Southeastern Promotions, Ltd. v. Conrad.*[9] It is obvious that defendants have not under-

9. Counsel for defendants so stated during the hearing held on this matter on April 4, 1983.

taken judicial proceedings to test the constitutional status of "Inserts," or that the denial of funds has constituted only a brief ban on the showing of the film. Nor is there any system followed by the college that ensures a prompt, final, judicial resolution of the question here at issue. In fact, there is no system at all, and judicial consideration of the "merits" of "Inserts" hinges still on the initiative of persons other than defendants. As defendants' treatment of "Inserts" does not satisfy *Bantam Books'* or *Southeastern Promotions'* requirements, only one other argument could possibly save their conduct from being deemed an illegal prior restraint.

■ Since the controversy arose, defendants have passed a "Resolution" that flatly prohibits the College from funding the showing of all "X"-rated movies on campus. If the "X" rating was a short-hand label for judicially-defined pornography, then defendants' content-based discrimination against funding such films could be deemed lawful. This argument must fail, however, since it is well-established that the Motion Picture ratings may not be used as a standard for a determination of constitutional status. *Engdahl v. City of Kenosha, Wisc.,* 317 F.Supp. 1133 (E.D.Wis.1970); *Motion Picture Ass'n of America v. Specter,* 315 F.Supp. 824 (E.D.Pa.1970). The standards by which the movie industry rates its films do not correspond to the *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1974), criteria for determining whether an item merits constitutional protection or not.[10] Clearly, defendants' conduct does not satisfy the *Bantam Books', Southeastern Promotions'* requirements for valid prior restraints. In addition, since defendants' conduct cannot be validated on the ground that the only films affected are per se unentitled to First Amendment protections, I find it highly probable that plaintiffs would succeed on the merits of their First Amendment claim. As a result, I am satisfied that plaintiffs have fulfilled the crucial "probability of success" requirement for injunctive relief.

■ Plaintiffs have also satisfied the other three requirements conditioning injunctive relief. The requirement of suffering "irreparable injury" absent the requested equitable relief has been satisfied by showing that plaintiffs' First Amendment rights are jeopardized. The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Westinghouse Broadcasting Co. v. Dukakis,* 409 F.Supp. 895 (D.Mass.1976); *Birkenshaw v. Haley,* 409 F.Supp. 13 (E.D.Mich.1974).

Plaintiffs have also established that, on balance, they will suffer greater harm if injunctive relief is denied than defendants will if it is granted. Because their First Amendment rights are at stake, plaintiffs may suffer harm of a very serious magnitude. This is a corollary of the high rank held by the First Amendment in the constitutional scale of values discussed earlier.[11] Defendants claim that they will lose some authority if plaintiffs' relief is granted, and that plaintiffs' success here will unleash a floodgate of similar demands from other campus groups. However, no authority is relinquished. Pornographic movies that meet the *Miller* test need not be permitted on campus. In addition, defendants' arguments are speculative. There is nothing in the record to indicate that similarly-situated groups stand ready to unleash unfounded claims against the College's treasury.

The last factor to consider is whether the public interest will be advanced by granting the requested relief. I find that it will, principally because the relief here requested is to safeguard the rights traditionally valued so highly by our society.

In sum, plaintiffs have fulfilled the requirements of injunctive relief by showing that they will probably succeed with their substantive claim of violation of their First Amendment rights; that the impending harm is irreparable in nature; that the harm they will suffer absent injunctive re-

---

**10.** *Compare* Appendix # 1, pp. 1338–1340 with *Miller v. California,* 413 U.S. 15, 23–27, 93 S.Ct. 2607, 2614–16, 37 L.Ed.2d 419 (1974).

**11.** *See* p. 1331, *supra.*

lief is greater than that defendants will bear when it is granted; and that the public interest will be helped, not hurt, by granting a preliminary injunction in the case at bar. Consequently, an Order will issue directing the defendants to allocate the $250.00 before the passage of the April 8th deadline on the ordering of "Inserts."

## CONCLUSION

We are reminded [12] that originally freedom to speak was deemed a gift from heaven and the Founding Fathers talked about it as a "natural" right of man. This, of course, was in the era of town meetings. A century later, however, Justices Holmes and Brandeis gave the concept a new connotation—the right to hear. "For only by the free flow of ideas does society become enriched. Only by the back and forth of controversy do we gain that capacity for critical analysis which tends to correct errors."

While I find that defendants must be directed forthwith to allocate $250 for the ordering of the movie, "Inserts," by the Grand Valley Student Senate, it is appropriate to note certain issues that are not before the court. At issue here was the constitutional validity of defendants' decision to block or impede the exercise of First Amendment activity, on the basis of its content, without any reference to the standards governing prior restraints. Whether the film "Inserts" is pornographic, within the meaning of *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1974), was not an issue in this case. In fact, as far as the court is aware, the movie has never been seen by the students seeking the funds nor by any college officials who have denied those funds. I have reached my conclusion about the system of regulation, not about the constitutional status of a particular movie affected by that system. Whether "Inserts" could or should be banned under the *Miller* standard has neither been raised

nor litigated; consequently, that determination, should it be raised, awaits another day.

## ·APPENDIX 1
## THE MOVIE RATING SYSTEM
### By JACK VALENTI
\* \* \*

### HOW IT ALL BEGAN

By the summer of 1966, it had become clear to knowledgeable observers that the U.S. film industry was in radical change. Where the change specifically started, and why, are obscured in a mix of social and economic upheaval.

But change there was.

Perhaps it started in the early 1950s when the Department of Justice, following a U.S. Supreme Court decision, brought about the divorcement of studio-and-theater ownership. When the big studios relinquished their theaters, the power that existed in my predecessors, Will H. Hays and Eric Johnston, and the Hollywood establishment was forever broken. From that collapse of authority came, slowly, the onward thrust of the filmmaker to garner a larger share in the creative command decisions.

When I became president of the Motion Picture Association of America (MPAA) \*, and the Association of Motion Picture and Television Producers (AMPTP) \*\*, in May 1966, the slippage of Hollywood studio authority over the content of films collided with an avalanching revision of American mores and customs.

The national scene was marked by insurrection on the campus, riots in the streets, rise in women's liberation, protest of the young, questioning of church, doubts about the institution of marriage, abandonment of old guiding slogans, and the crumbling of social traditions. It would have been foolish to believe that movies, that most creative of art-forms, could have remained

---

12. *The Best Is Yet,* Morris L. Ernst.

\* Member companies of MPAA: Avco Embassy, Columbia, Walt Disney, Filmways, MGM, Twentieth Century-Fox, Paramount, United Artists, MCA-Universal, Warner Bros.

\*\* Member companies: 80 organizations producing theatrical motion pictures and television material.

unaffected by the change and torment in our society.

*A New Kind of American Movie*

The result of all this was the emergency of a "new kind" of American movie—frank and open, and made by filmmakers subject to very few self-imposed restraints.

Almost within weeks in my new duties I was confronted with controversy neither amiable nor fixable. The first issue was the film "Who's Afraid of Virginia Woolf?", in which for the first time on the screen the word "screw" and the phrase "hump the hostess" were heard. In company with the MPAA's general counsel, Louis Nizer, I met with Jack Warner, the legendary chieftain of Warner Bros. and his top aide, Ben Kalmenson. We talked for three hours, and the result was deletion of "screw" and retention of "hump the hostess", but I was uneasy over the meeting.

It seemed wrong that grown men should be sitting around discussing such matters. More, I was uncomfortable with the thought that this was just the beginning of an unsettling new era in film, in which we would lurch from crisis to crisis, without any suitable solutions in sight.

The second issue surfaced only a few months later. This time it was Metro-Goldwyn-Mayer and the Antonioni film "Blow-Up." I met with the company head, Bob O'Brien, for this movie also represented a first—the first time a major distributor was marketing a film with nudity in it. The Production Code Administration in California had denied the seal. I backed the decision whereupon MGM distributed the film through a subsidiary company, thereby flouting the voluntary agreement of MPAA member companies that none would distribute a film without a Code seal.

Finally, in April 1968, the U.S. Supreme Court upheld the constitutional power of states and cities to prevent the exposure of children to books and films which could not be denied to adults.

It was plain that the old system of self-regulation, begun with the formulation of MPAA in 1922, had broken down. What few threads holding together the structure created by Will H. Hays had now snapped.

I knew that the mix of new social currents, the irresistible force of creators determined to make "their" films (full of wild candor, groused some social critics), and the possible intrusion of government into the movie arena demanded my immediate action.

Within weeks, discussions of my plan for a movie rating system began with the president of the National Association of Theater Owners (NATO), and with the governing committee of the International Film Importers & Distributors of America (IFIDA), an assembly of independent producers and distributors.

Over the next five months, I held more than 100 hours of meetings with these two organizations, as well as with guilds of actors, writers, directors and producers, with craft unions, with critics, with religious organizations, and with the heads of MPAA member companies.

*The Birth of the Ratings*

By early fall, the plan was designed and approved. On November 1, 1968, the voluntary film rating system of the motion picture industry became a fact, with three organizations, NATO, IFIDA, and MPAA as partners in the enterprise.

That initial plan was, in essence, the same as the program now in effect. Few changes of substance have occurred. There were four rating categories: G for general audiences—all ages admitted; M * for mature audiences—parental guidance suggested; R for Restricted—under 16s ** must be accompanied by parent or guardian; X no one under 16 ** admitted.

My original intent had been to use only three rating categories, ending in R. It was my view that a parent ought to have

---

* Because this label was misunderstood by the public, it was finally changed to "PG—parental guidance suggested—some material may not be suitable for pre-teenagers."

** Later raised to under 17 years of age.

the right to accompany children to any movie the parent chose without the movie industry or the government denying that right. But the exhibitor organization (NATO) urged the creation of the X category, fearful of possible legal redress under local or state law. I acquiesced in NATO's reasoning and the four-category system was installed.

The rating system meant the dismantling of the Production Code Administration with its rigid restrictions, which had been in effect since the 1930s. Our rating concept was a totally new approach.

We would no longer "approve or disapprove" the content of a film, but rather would rate movies for parents who could then make an informed decision on whether their children should attend. This turnabout was not easy to achieve. My predecessors, Will Hays and Eric Johnston, had opposed changing the stern Seal of Approval test to a system of rating for children.

But it was a turn in philosophy and action that social change demanded we make, and in the light of a new social environment we made the turn.

*Dual Responsibilities*

From the very beginning of my tenure at the Association, I had sought a way to assure freedom of the screen, to underbrace the right of the filmmaker to say what he chose in the way and form he determined without anyone forcing him to cut one millimeter of film or threatening to refuse him exhibition.

Yet, at the same time, there had to be some framework of self-discipline, some manner of restraint, in order to fulfill a public obligation. Parents needed to know *in advance* what kind of movie was being exhibited at the local theater. It was because of this juxtaposition of ideals and goals that the voluntary film rating system seemed to be the sanest and most practical design to achieve both objectives, despite obvious frailties and inevitable public disagreements over specific ratings.

Under the rating program, the filmmaker became free to tell his story in his way without anyone thwarting him. The price he would pay for that freedom would be the possible restriction on viewing by children. I held the view that freedom of the screen was not defined by whether children must see everything a filmmaker conceived.

I would hope it is fair to say that today the screen has never been more free from the standpoint of the filmmaker's right to create any story he wants to tell. And, at the same time, the public is better advised in advance by the ratings about the content of films than ever before, and parents can be confident their children are restricted in viewing certain films. No other entertainment communications medium turns away business at the boxoffice to fulfill its pledge to the public.

THE PURPOSE OF THE RATING SYSTEM

From the outset the purpose of the rating system was to provide *advance information to enable parents* to make judgments on movies they wanted their children to see or not to see. Basic to the program was and is the *responsibility of the parent to make the decision.*

The Rating Board does not rate for quality or the lack of it. That role is left to the movie critic and the audience. We would have destroyed the rating program in its infancy if we had become arbiters of how "good" or how "bad" creatively a movie was.

The only objective of the ratings is to advise the parent in advance so he or she may determine the possible suitability or unsuitability of viewing by children. But, to repeat, the rating would not even make a final judgment on that; except for the X rating, the parent's decision remained the key to children's attendance.

Inherent in the rating system is the fact that to those 17 and over, or without children, the ratings have little if any meaning.

The Rating Board's criteria are four: theme, language, nudity and sex, and violence, and part of the rating comes from the assessment of how each of these elements is treated in each individual film.

There is no special emphasis on any of the elements. All are considered and all are examined before a rating is given.

Contrary to popular but uninformed notions, violence has from the outset been a key factor in ratings. (Many violent films have been given X ratings, but most of the directors have chosen, on their own, to revise the extremely violent sequences in order to receive an R rating.)

## HOW THE RATINGS ARE ARRIVED AT

The ratings are decided by a Rating Board located in Hollywood. It is a full-time Board, composed of seven persons, headed by a chairman. There are no special qualifications for Board membership, except one must love movies, must possess an intelligent maturity of judgment, and have the capacity to put himself or herself in the role of most parents and view a film as most parents might—parents trying to decide whether their younger children ought to see a specific film.

In my role as MPAA president, I do not take part in rating discussions, do not interfere in rating decisions, and do not overrule or dissuade the Board or its chairman from any decisions they make.

Critics of the rating system have been vocal about many things, but no one has yet accused the Board of deliberately fudging a decision or bowing to pressure or doing anything that would be inconsistent with its integrity. And that is no insubstantial asset.

No one is forced to submit a film to the Board for rating, but the overwhelming number of producers creating entertaining, seriously intended, responsible films (*not* hard core pornography) do in fact submit their films for ratings. Most makers of pornographic movies do not submit their films but instead, within the rules of the rating system, self-apply an X rating and go to market. The other symbols, G, PG, and R, are registered with the U.S. Patent and Trademark Office as Certification marks of the MPAA and cannot be used by any company which has not officially submitted its film for rating. They may *not* be self-applied.

NATO estimates that about 85% of the exhibitors in the nation participate in the rating program and enforce its admission restrictions.

### The Board Votes on Ratings

The Board views each film and after group discussion votes on the rating. Each Board member completes a rating form spelling out his or her reason for the rating in each of the four categories of theme, violence, language, and nudity and sex, and then gives the film an overall rating based on the category assessments.

The rating is decided by majority vote.

The producer of a film has a right under the rules to inquire as to the "why" of the rating. The producer also has the right, based on the reasons for the rating, to edit the film to try for a less severe rating. The re-edited film is brought back to the Rating Board, and the process of rating goes forward again.

### Advertising and Trailer Policy

Film advertising is also part of the film industry's self-regulatory mechanism.

All advertising for rated motion pictures must be submitted to the Advertising Code Administration for approval prior to release of the film to the public. This includes, but is not limited to, print ads, radio and TV spots, pressbooks, and theatrical trailers.

Trailers are an important aspect of the program. Trailers are either designated G, which means they may be shown with all feature films, or R, which limits their use to feature films rated R or X. There will be in G-designated trailers no scenes that caused the feature to be rated PG, R, or X.

Each trailer carries at the front a tag which tells two things: (1) the audience for which the trailer has been approved, and (2) the rating of the picture being advertised. The tag for G-rated trailers will have a green background; the tag for R-rated trailers will have a red background. The color is to alert the projectionist against mismatching trailers with the film being shown on the theater screen.

### Appeal of Ratings

A producer who for any reason was displeased with a rating could appeal the decision to the Rating Appeals Board, which sits as the final arbiter of ratings.

The Appeals Board comprises 24 members, men and women from MPAA, NATO, and IFIDA.

They gather as a quasi-judicial body to view the film and hear the appeal. After the screening, the producer whose film is being appealed explains why he or she believes the rating was wrongly decided. The chairman of the Rating Board states the reason for the film's rating. Both the producer and the Rating Board representative have an opportunity for rebuttal. In addition, the producer may submit a written presentation to the Board prior to the oral hearing.

After Appeals Board members question the two opposing representatives they are excused from the room. The Board discusses the appeal and then takes a secret ballot. It requires a two-thirds vote of those present to overturn a Rating Board decision.

By this method of appeal, controversial decisions of the Rating Board can be examined and any rating deemed a mistake set right.

The decision of the Appeals Board is final and cannot be appealed, although the Appeals Board has the authority to grant a rehearing on the request of the producer.

## WHAT THE RATINGS MEAN

Essentially the ratings mean the following:

*G:* "General Audiences—All ages admitted."

This is a film which contains nothing in theme, language, nudity and sex, or violence which would, in the view of the Rating Board, be offensive to parents whose younger children view the film. The G rating is *not* a "certificate of approval", nor does it signify a children's film. Some profoundly significant films are rated G (for example, "A Man For All Seasons").

Some snippets of language may go beyond polite conversation but they are common everyday expressions. No words with sexual connotations are present in G-rated films. The violence is at a minimum. Nudity and sex scenes are not present.

*PG:* "Parental Guidance Suggested; some material may not be suitable for children." This is a film which clearly needs to be examined or inquired about by parents before they let their younger children attend. The label PG plainly states that parents *may* consider some material unsuitable for their children, but the parent must make this decision.

Parents are warned against sending their children, unseen without inquiry, to PG-rated movies.

There may be profanity in these films, but harsher sexually derived words will vault a PG rating into the R category. There may be violence but it is not deemed so strong that everyone under 17 need be restricted unless accompanied by a parent. Nor is there cumulative horror or violence that may take a film into the R category.

There is no explicit sex on the screen, although there may be some indication of sensuality. Brief nudity may appear in PG-rated films, but anything beyond that puts the film into R.

The PG rating, suggesting parental guidance, is thus a strong alert for special examination of a film by parents before deciding on its viewing by their children.

Obviously the line is difficult to draw and the PG-rated film is the category most susceptible to criticism. In our plural society it is not easy to make subjective judgments without incurring some disagreement. So long as parents know they must exercise parental responsibility, the PG rating serves as a meaningful guide and as a warning.

*R:* "Restricted, under 17s require accompanying parent or guardian."

This is an adult film in some of its aspects and treatment so far as language, violence, or nudity, sexuality or other content is concerned. The parent is advised in advance the film contains adult material and takes his children with this advisory clearly in mind.

The language may be rough, the violence may be hard, and while explicit sex is not to be found in R-rated films, nudity and love-making may be involved.

Therefore, the R rating is strong in its advance advisory to parents as to the adult content of the film.

*X:* "No one under 17 admitted." This is patently an adult film and no children are allowed to attend. It should be noted, however, that X does *not* necessarily mean obscene or pornographic in terms of sex or violence. Serious films by lauded and skilled filmmakers may be rated X. The Rating Board does not attempt to mark films as obscene or pornographic; that is for the courts to decide legally. The reason for not admitting children to X-rated films can relate to the accumulation of brutal or sexually connected language, or of explicit sex or excessive and sadistic violence.

*Appraisal*

In any appraisal what is "too much" becomes a controversial issue. How much is too much violence? Are classic war-type films too violent; marines storming the beaches of Iwo Jima killing and wounding the enemy, is that too much? Is the dirt-street duel between the cattle rustler and the sheriff too violent, or does it require the spilling of blood to draw a more severe rating? How does one handle a fist fight on the screen, where is the dividing line between "all right" and "too much" for a particular classification?

The same vexing doubts occur in sex scenes or those where language rises on the Richter scale. The result is controversy, inevitable, inexorable, and that is what the rating system has to endure.

The raters try to estimate what most American parents think about the appropriateness of film content so that parents at the very least are cautioned to think seriously about what films they may wish their children to see.

## HOW THE CRITERIA ARE CONSTRUCTED

To oversee the Rating Board, the film industry has set up a Policy Review Committee consisting of officials of MPAA, NATO, and IFIDA. These men and women monitor past ratings, set guidelines for the Rating Board to follow, and make certain that the Board carries them out reasonably and appropriately.

Because the rating program is a self-regulatory apparatus of the film industry, it is important that no single element of the industry take on the authority of a "czar" beyond any discipline or self-restraint.

## THE PUBLIC REACTION

We count it crucial to make regular soundings to find out how the public perceives the rating program, and to measure the approval and disapproval of what we are doing.

In each of the last 12 years the well-known polling organization, the Opinion Research Corporation of Princeton, New Jersey, has taken nationwide surveys to appraise the rating system. The 1980 results, as in the past, show that the program receives approval by landslide majorities. Some favorable responses range as high as 70 percent, with most returns in the 60s in attesting to the usefulness of the ratings as guides to children's attendance. This would mean that three out of five persons in the survey gave a favorable verdict to the ratings.

Other 1980 survey highlights:

The one significant change occurred among frequent moviegoing adults, those attending movies at least once in six months. They reported by 70% they considered the ratings to be very to fairly useful as guides to children's attendance. *This was an increase of ten percentage points over 1979.* To 26% the ratings were not very useful.

There were losses in 1980 among parents with children, but not by margins that were statistically significant.

Among all adults with children under 18 the very-fairly useful category dropped to 61%, down from 65% in 1979. Twentyeight percent reported the ratings not very useful. The margin recorded by parents with children under 13 was 62%, down from 66% in 1979. The not-very-useful rate was 26%. A significant statistical change in these categories would have been six percentage points.

Other surveyed categories—all adults, moviegoing adults, total moviegoing public

age 12 and older, moviegoing teenagers, persons with some college education—all remained in 1980 within the limits of the margin of error, and thus without significant change.

The motion picture industry began the voluntary ratings on November 1, 1968 for the prime purpose of assisting parents in the not-always-easy task of forming the moviegoing habits of their children.

The rating system isn't perfect but in an imperfect world it seems each year to match the expectations of those whom it is designed to serve—parents of America.

## APPENDIX 2

## STIPULATED FACTS

1. Plaintiff Timothy Swope is an adult residing in Allendale, Michigan, County of Ottawa, within the Western District of Michigan. He is a student at Grand Valley State College. He is President of the Student Senate.

2. Plaintiff Michael Hartman is an adult residing in Allendale, Michigan, County of Ottawa, within the Western District of Michigan. He is a student at Grand Valley State College. He is Vice-President of the Student Senate.

3. Plaintiff Diane Eskin is an adult residing in Allendale, Michigan, County of Ottawa, within the Western District of Michigan. She is a student at Grand Valley State College. She is a Senator serving on the Student Senate.

4. Plaintiff Michelle Gentile is an adult residing in the City of Grand Rapids, Michigan, County of Kent, with the Western District of Michigan. She is a student at Grand Valley State College.

5. The plaintiff Student Senate of Grand Valley State College is an unincorporated association within the college community which exists to: ensure a "student voice to the administration and the Board of Control" as to institutional policies; "promote the welfare and progress of the college community"; "enforce" "rights" of students and "uphold" their "responsibilities"; "establish an effective and efficient" "responsive and responsible" form of student government; "provide for discussion, investigation and expedient resolution of student problems, concerns, and ideas", and "to make the role of the student rewarding and meaningful...", inter alia.

6. It is composed of 30 members who are students at Grand Valley State Colleges. The members are chosen by the student body. It has a number of committees, including the Programming Committee which has its purpose:

"to provide a well balanced activity program for the entire Grand Valley State College community; to survey and research the activity needs of the community and respond by directly sponsoring, planning, booking, scheduling, and publicizing activities and events of extra-curricular/co-curricular nature that are not already provided by a college unit; to fund student organizations to provide activity programs in specific areas of interest; to evaluate every Senate activity program as to its affect on the community and report all results to the Senate."

7. Included within the purview of the Programming Committee is the surveying of interest among the student body in films and concerts and recommending to the Student Senate the scheduling of such activities for student entertainment and/or stimulation of and exchange of ideas.

8. The Student Senate is allocated $60,-000.00 per year for programming of student activities including the ordering and showing of motion pictures.

9. Defendant Arend Lubbers is the President of Grand Valley State College. He is the Chief Administrative Officer and is responsible for administration of the college and carrying out the policies, rules and regulations of the college.

10. Defendant Linda Johnson is the Dean of Students of Grand Valley State College. She is responsible for administering policies, rules in non-curricular areas of student affairs, including programming of student activities such as showing films. She answers to defendant Lubbers through the Provost of Grand Valley State College.

11. Defendant Grand Valley State College is a constitutionally created, state funded institution of higher education located in Ottawa County, State of Michigan. See Constitution 1963, Art. 8 § 4.

12. Defendant Board of Control of Grand Valley State College is a constitutionally created "body corporate" which has "general supervision of the institution and the control and direction of all expenditures from the institution's funds." See Constitution 1963, Art 8 § 6.

13. In the past, GVSC has collected a student activities fee of $3.00. The money generated by this fee went to the Student Senate. Declining enrollment resulted in a decline in the funds generated by the student activities fee. In the late 1970's the Board determined to cancel the student activities fee and include as an item in the GVSC budget a $60,000 student activities allocation. The allocation has remained at $60,000 since its inception. The allocation is not determined by the number of students and is not satisfied through funds collected by the general services fee.

The general services fee is a fee of $15.00 assessed against each student per registration. The general services fee is not earmarked for any purpose but, rather, is a part of tuition. The purpose of the general services fee is to provide a technique for collecting more tuition from part-time students in order to reflect the fact that part-time students, who pay less in tuition per registration, still have full access to campus facilities. The general services fee was created within the last eight to nine years and was not related and is not related to the student activities fee.

The general services fee is treated like other tuition money in that it is folded into the general fund and dispersed by the Board of Control like all other monies in the general fund.

14. Ron VanSteeland indicates a Board resolution adopted April 11, 1980 which states that effective the summer term of 1980 the student activities allocation will be .32 per credit hour and effective the year 1980–81 the minimum amount of the alloca-

tion will be $60,000 student activities, including the showing of motion pictures.

15. Each semester a proposed schedule of films is presented by the Student Senate to the administration. In the fall semester of 1982, the Student Senate conducted a survey among students in order to learn the kinds of activities and programs the students would support by attending. In the category regarding movies 108 persons out of 215 surveyed indicated they would be interested in seeing an X-rated motion picture. Thereafter, in the fall semester of 1982, the film "Inserts" was submitted by the Student Senate to the administration. (See plaintiffs' proposed Exhibit 1).

16. Plaintiffs were verbally informed by defendant Johnson and an administrative assistant to defendant Johnson that funds would not be transferred to allow the ordering of this film.

17. The normal procedure for ordering films is to submit a request to an administrative assistant to defendant Johnson who authorizes the issuance of a check by the Purchasing Department of the defendant Grand Valley State College. Tim Swope, President of the Student Senate, sent a memorandum dated September 20, 1982, to Linda Johnson requesting clarification as to why the funds would not be authorized. (See attached proposed Exhibit 2).

18. Following the verbal refusal to authorize transfer of funds for ordering "Inserts", plaintiffs and others entered into good faith negotiations with defendant Lubbers, defendant Johnson and others in an effort to come to a mutually satisfactory resolution.

19. Over the course of a number of months, it became obvious that such mutually acceptable resolution was not to be forthcoming. At a Student Senate meeting of October 11, 1982, the denial of funds to show "Inserts" was debated by officers of the Student Senate and by defendants Linda Johnson and President Lubbers. The Senate Student voted to pursue any and all legal action necessary to protect their rights of expression and due 'process with regard to their freedom to schedule activities.

Thereafter, the students approached the American Civil Liberties Union and requested assistance. (See proposed Exhibit 3).

20. The original request to show the movie "Inserts" was made in September, 1982, and as of November 3, 1982, students had received no direct answer from the defendants. Student Senate President, Timothy Swope, corresponded by memorandum to defendant Lubbers on January 11, 1983, again requesting an answer regarding the administration's reasons for denial. (See attached proposed Exhibits 4 and 5).

21. The movie "Inserts" was again submitted for approval by means of a request for transfer of funds to order the film. On or about February 14, 1983, the chairman of the Programming Committee of the Student Senate submitted a memo requesting the transfer of $250.00 into the movies account to order the film "Inserts". (See Exhibit A of plaintiffs' complaint).

22. Defendants Lubbers and Johnson denied the request and stated no reason to plaintiffs. The American Civil Liberties Union corresponded to President Lubbers on behalf of the Student Senate in a letter dated February 23, 1983, and later in the month of February, 1983, the Board of Control passed a resolution which attempted to set forth a policy regarding the funding of X-rated films. The resolution does not ban the showing of X-rated films on campus. (See proposed Exhibit 6 and Exhibit B of plaintiffs' complaint).

23. Films are normally shown in the Louis Armstrong Theater at Grand Valley State College. A $1.00 admission price is charged. The films are open to students, faculty, administration and others not connected with the college community *per se* who are aware of the showing of a particular film and desire to view it. However, no one is required to attend or view any film. The films are shown by students and tickets are sold and collected by students.

24. The film "Inserts" is a motion picture about the personal crisis of a silent motion picture director in the 1930's who turns to the making of "pornographic" movies. It stars the well-known actor, Richard Dreyfus, and was released by a major film company (United Artists). The film has been given an "X" rating by the motion picture industry's Rating Administration. (See Exhibit C attached to complaint).

25. The motion picture industry's rating system is explained in proposed Exhibit 7.

26. Plaintiff Student Senate is prepared to provide an individual to check identification in an effort to assure that no one under 17 years of age will be admitted to view the film "Inserts". The film is scheduled for showing on April 22, 1983 the last showing of a film of the school year.

27. The $250.00 charge must be submitted to the distributor of the film on or before April 8, 1983 or it will simply not be available in time for its scheduled showing.

28. No other film has been denied approval by defendants, including a number with "R" ratings.

29. Prior to the promulgation of Exhibit B there were no established standards or guidelines whatsoever regarding the selection of films for showing.

30. The Grand Valley Student Senate through its various committees and as a body as a whole has exercised autonomy in decision making with respect to the use of the funds allocated to it by the college.

31. The mechanics of the authorization of funds is as follows:

i. The Student Senate or one of its committees writes a memo to Linda Johnson or one of her assistants requesting that funds be issued for a particular activity or project;

ii. Approval by Linda Johnson or her assistant is given to the purchasing department with direction to issue a check to a vendor;

iii. Films requested by the Student Senate are acquired through use of a GVSC purchase order. The film is to be delivered to one of the persons in Linda Johnson's office. It is generally noted on the purchase order that the film has been requested by the Student Senate. The check which

is written to pay for the film is a standard GVSC check.

32. Grand Valley State College does not have a system in effect that requires it to seek prompt judicial determination as to whether material is protected material or unprotected material for First Amendment purposes.

33. The showing of films at Grand Valley State College through the Student Senate's film series is an extra curricular activity and is not an activity which is part of the college's regular curriculum.

Dated: April 1, 1983

## APPENDIX 3
## RESOLUTION FOR THE BOARD OF CONTROL OF GRAND VALLEY STATE COLLEGE

WHEREAS, Article VIII of the Constitution of the State of Michigan establishes institutions of higher education, and

WHEREAS, Section 4 of that Article authorizes the establishment of Grand Valley State College, and

WHEREAS, Section 6 of that Article declares that the Board of Control ". . . shall have general supervision of the institution and the control and direction of all expenditures from the institution's fund . . ." and

WHEREAS, the Board of Control is unaware of any constitutional or statutory basis on which any particular student or group of students has a right to direct the Board of Control to expend institutional funds for any particular educational or entertainment purpose, and

WHEREAS, the use of institutional funds for any particular educational or entertainment purpose through the showing of a particular film or type of film, as well as any other form of education or entertainment requiring the use of institutional funds, is within the control and direction of the Board of Control, and

WHEREAS, the College recognizes that individual students and faculty members have rights of expression which are protected by the First Amendment to the Constitution of the United States of America, so long as those rights are exercised in a way that is consistent with the rights of this institution, the rights of other persons on the campus, and not in violation of local community standards, and

WHEREAS, the College recognizes and accepts its responsibility to be a forum for the free and open exchange of ideas and opinions consistent with the constitutional rights of all members of its community and the College does not restrain those individual rights in any manner by its limitation on the expenditure of institutional funds, and

WHEREAS, nothing in this resolution is intended to abridge the academic freedom of faculty in the performance of their academic responsibilities,

NOW THEREFORE BE IT RESOLVED, that no institutional funds of this College shall be used by student organizations for the acquisition of X-rated films, such films being the type which, by their nature show excessive violence and/or sexually explicit material. The Administration is directed to review and authorize the expenditure of institutional funds in accordance with this policy.